RECORD NO. 18-4414(L)
CONS./W 18-4453

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiffs-Appellee,*

v.

MARCUS ROOSEVELT TAYLOR;
DANIEL THOMAS HERSL,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

**CONSOLIDATED OPENING BRIEF OF APPELLANTS**

C. William Michaels
ATTORNEY AT LAW
1579 Dellsway Road
Baltimore, Maryland 21286
(410) 321-5770
cwmichaels@earthlink.net

H. Mark Stichel
ASTRACHAN GUNST
& THOMAS PC
217 East Redwood Street
Baltimore, MD 21202
(410) 783-3547
hmstichel@agtlawyers.com

*Counsel for Appellant
Marcus Roosevelt Taylor*

Stuart A. Berman
Nida Kanwal  *On Brief*
LERCH, EARLY &
BREWER, CHARTERED
Suite 460
7600 Wisconsin Avenue
Bethesda, MD 20814
(301) 657-0729
saberman@lerchearly.com

*Counsel for Appellant
Daniel Thomas Hersl*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ...................................................................v

JURISDICTIONAL STATEMENT .......................................................1

ISSUES PRESENTED.............................................................................1

STATEMENT OF THE CASE.................................................................2

I.     The Charges....................................................................................2

II.    Relevant Pretrial and Trial Motions and Rulings.................................4

       A.    Pretrial Motions....................................................................4

       B.    Motion for Mistrial...............................................................5

III.    The Verdict and Jury Findings Regarding Racketeering Acts..............5

       A.    Racketeering Act 2: Shawn Whiting,
             Jan. 24, 2014 (Taylor)...............................................................6

       B.    Racketeering Act 3: Jimmie Griffin,
             Nov. 5, 2014 (Hersl) ..................................................................8

       C.    Racketeering Act 4: Herbert Tate,
             Nov. 27, 2015 (Hersl) ...........................................................10

       D.    Racketeering Act 5: Antonio Santiful,
             Nov. 28, 2014 (Hersl) ...........................................................11

       E.    Racketeering Act 8 and Count Three:
             Oreese Stevenson, Mar. 22, 2016 (Taylor) ...........................13

       F.    Racketeering Act 10 and Count Five:
             Ronald and Nancy Hamilton, July 8, 2016 (Hersl) ................15

i

G.  Racketeering Act 12: Sergio Summerville,
Sept. 7, 2016 (Taylor) ............................................................19

H.  Racketeering Acts 14, 15, 18, 21 (Hersl),
17, 20, 22 (Taylor) ..................................................19

IV.  Motions for New Trial and Sentencing Proceedings .........................20

SUMMARY OF ARGUMENT ...................................................................21

STANDARD OF REVIEW ........................................................................26

ARGUMENT ..........................................................................................28

I.  COUNT ONE SHOULD BE REVERSED BECAUSE THE
GOVERNMENT FAILED TO PROVE BEYOND A
REASONABLE DOUBT THAT USE OF INTERSTATE
WIRES WAS FORESEEABLE TO ANY CONSPIRATOR
AND THEREFORE FAILED TO PROVE ANY
CONSPIRATOR AGREED TO COMMIT TWO
RACKETEERING ACTS ..................................................28

II.  COUNT TWO SHOULD BE REVERSED BECAUSE THE
GOVERNMENT FAILED TO PROVE BEYOND A
REASONABLE DOUBT THAT EITHER DEFENDANT
COMMITTED TWO RACKETEERING ACTS ............................35

A.  The Evidence Was Insufficient to Prove That Hersl
Committed Wire Fraud or Committed or Conspired to
Commit Robberies ..................................................36

1.  The Government Fails to Prove Hersl Committed
Wire Fraud in Racketeering Acts 14, 15, 18, and 21 .....36

2.  The Government Failed to Prove Hersl Committed
Robbery in Racketeering Act 3 (Griffin) ......................36

3.  The Government Failed to Prove Hersl Committed
Robbery in Racketeering Act 4 (Tate) ..........................39

4.     The Government Failed to Prove Hersl Committed
       Robbery in Racketeering Act 5 (Santiful) ....................41

5.     The Government Failed to Prove Hersl Conspired to
       Commit Robbery in Racketeering Act 10
       (Hamiltons) .................................................................42

B.  The Evidence Was Insufficient to Prove That Taylor
    Committed Wire Fraud or Committed or Conspired to
    Commit Robberies ..................................................................44

    1.     The Government Fails to Prove Taylor Committed
           Wire Fraud in Racketeering Acts 17, 20, and 22 ..........44

    2.     The Government Failed to Prove Taylor Committed
           Robbery in Racketeering Act 2 (Whiting) ....................44

    3.     The Government Failed to Prove Taylor Committed
           Robbery in Racketeering Act 8 (Stevenson) ................45

    4.     The Government Failed to Prove Taylor Committed
           Robbery in Racketeering Act 12 (Summerville) ..........46

III.  COUNTS THREE AND FIVE SHOULD BE REVERSED
      BECAUSE THE GOVERNMENT FAILED TO PROVE
      BEYOND A REASONABLE DOUBT THAT A ROBBERY
      WAS COMMITTED AND, WITH REGARD TO COUNT
      FIVE, FAILED TO PROVE THAT THE ALLEGED
      ROBBERY AFFECTED INTERSTATE COMMERCE ..................47

      A.  Neither Defendant Committed a Robbery ...............................47

      B.  The Alleged Robbery of the Hamiltons Did Not Affect
          Interstate Commerce [Hersl Only]...........................................48

IV.  THE DISTRICT COURT ABUSED ITS DISCRETION BY
     DENYING DEFENDANTS' MOTION IN LIMINE AND
     SUBSEQUENT OBJECTIONS SEEKING TO LIMIT THE
     GOVERNMENT'S USE OF THE LEGAL TERM "ROBBERY"....50

V.      THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING DEFENDANTS' MOTION FOR MISTRIAL FOLLOWING A LENGTHY, HIGHLY PREJUDICIAL OUTBURST BY GOVERNMENT WITNESS RONALD HAMILTON......................................................................55

VI.     THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING TAYLOR'S MOTION TO DISMISS OR FOR A CONTINUANCE BECAUSE OF PREJUDICAL PRETRIAL PUBLICITY [TAYLOR ONLY] ...............................................60

VII.    THE DISTRICT COURT ERRED BY DENYING A MOTION FOR NEW TRIAL REGARDING *BRADY* ISSUES CONCERNING GOVERNMENT WITNESS ANTONIO SANTIFUL......................................................................63

VIII.   THE DISTRICT COURT IMPOSED UNREASONABLE SENTENCES ON BOTH DEFENDANTS .........................................68

        A.    Hersl .........................................................................68

        B.    Taylor ......................................................................72

CONCLUSION...........................................................................73

CERTIFICATE OF COMPLIANCE...............................................74

CERTIFICATE OF SERVICE .......................................................75

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Brady v. Maryland,* 373 U.S. 83 (1963) ..........................................20, 63, 65, 67, 68

*Coles v. State,* 374 Md. 114 (2003) ........................................................36

*Cooper v. State*, 9 Md. App. 478 (1970)....................................................42

*Davis v. Alaska*, 415 U.S. 308 (1974) ....................................................67

*Estelle v. Williams,* 425 U.S. 501 (1976)................................................58

*Gall v. United States*, 552 U.S. 38 (2007) ..............................................27

*Giglio v. United States*, 405 U.S. 150 (1972) ..........................................66

*Hall v. State*, 233 Md. App. 118 (2017) ..................................................36

*Holbrook v. Flynn,* 475 U.S. 560 (1986) ................................................58

*Hook v. State,* 315 Md. 25 (1989).........................................................39

*In re Sealed Case No. 99-3096 (Brady Obligations)*,
    185 F.3d 887 (D.C. Cir. 1999) ........................................................66

*Irvin v. Dowd*, 366 U.S. 717 (1961).......................................................61

*Jackson v. Virginia,* 443 U.S. 307 (1979)................................................26

*Koon v. United States*, 518 U.S. 81 (1996)...............................................69

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................65, 66

*Leeson v. State,* 293 Md. 425 (1982) ......................................................39

*Metheny v. State*, 359 Md. 576 (2000)....................................................36

*Mitchell v. Esparza,* 540 U.S. 12 (2003) ..................................................54

*Morris v. State*, 192 Md. App. 1 (2010) ....................................................36

*Moseley v. Branker*, 550 F.3d 312 (4th Cir. 2008) ...................................67

*Nash v. United States,* 54 F.2d 1006 (2d Cir. 1932) .................................58

*People v. Wharton,* 53 Cal.3d 522 (1991) ................................................59

*Pereira v. United States,* 347 U.S. 1 (1954) ............................................29

*Salinas v. United States*, 522 U.S. 52 (1997).........................................28

*Sheppard v. Maxwell*, 384 U.S. 333 (1966)..............................................61

*Silva v. State,* 422 Md. 17 (2011)....................................................37, 40, 43

*Skilling v. United States*, 561 U.S. 388 (2010) .......................................62

*Snowden v. State*, 321 Md. 612 (1991) ....................................................36

*State v. Foster,* 263 Md. 388 (1971) ........................................................37

*State v. Gower,* 267 Md. 602 (1973)..........................................................39

*State v. Raines,* 326 Md. 582 (1992).........................................................37

*United States v. Auten,* 632 F.2d 478 (5th Cir. 1980) ..............................66

*United States v. Bartko*, 728 F.3d 327 (4th Cir. 2013) .............................27

*United States v. Bengali,* 11 F.3d 1207 (4th Cir.1993).............................48

*United States v. Bentz,* 21 F.3d 37 (3d Cir. 1994) ...................................32

*United States v. Bermes,* 9 F. App'x 207 (4th Cir. 2001)..........................32

*United States v. Brumley,* 59 F.3d 517 (5th Cir. 1995),
  *opinion withdrawn and superseded on reh'g,* 79 F.3d 1430
  (5th Cir. 1996), *opinion vacated and reh'g en banc granted,*
  91 F.3d 676 (5th Cir. 1996), *aff'd en banc,* 116 F.3d 728
  (5th Cir. 1997) ...................................................................33, 34

*United States v. Burfoot,* 899 F.3d 326 (4th Cir. 2018)........................22, 31, 32, 34

*United States v. Collins,* 40 F.3d 95 (5th Cir. 1994) ...............................................49

*United States v. Dorlouis,* 107 F.3d 248 (4th Cir.1997).........................................27

*United States v. Engle,* 592 F.3d 49 (4th Cir. 2010)................................................68

*United States v. Goodwin*, 457 U.S. 368 (1982)......................................................71

*United States v. Gray,* 788 F.2d 1031 (4th Cir. 1985)..............................................63

*United States v. Ham,* 998 F.2d 1247 (4th Cir. 1993) .............................................57

*United States v. Hampton*, 441 F.3d 284 (4th Cir. 2006) ........................................27

*United States v. Hooker,* 841 F.2d 1225 (4th Cir.1988) (*en banc*).........................35

*United States v. Howard,* 773 F.3d 519 (4th Cir. 2014)..........................................68

*United States v. Jefferson,* 674 F.3d 332 (4th Cir. 2012) ........................................29

*United States v. Johnson,* 587 F.3d 625 (4th Cir. 2009).........................................57

*United States v. Johnson,* 617 F.3d 286 (4th Cir. 2010).........................................54

*United States v. Jones,* 16 F.3d 487 (2d Cir. 1994) ................................................59

*United States v. LaVallee*, 439 F.3d 670 (10th Cir. 2006)......................................69

*United States v. Loayza,* 107 F.3d 257 (4th Cir. 1997) ...........................................29

*United States v. Lothian,* 976 F.2d 1257 (9th Cir. 1992).........................................33

*United States v. Mannie,* 509 F.3d 851 (7th Cir. 2007)............................................58

*United States v. Martin,* 756 F.2d 323 (4th Cir. 1985)............................................57

*United States v. McIver,* 470 F.3d 550 (4th Cir. 2006) ..........................................53

*United States v. Morrow,* 731 F.2d 233 (4th Cir. 1984)..........................................57

*United States v. Murray,* 784 F.2d 188 (6th Cir. 1986)..........................................58

*United States v. Osorio*, 929 F.2d 753 (1st Cir. 1991) ..........................................66

*United States v. Perdomo*, 929 F.3d 967 (3d Cir. 1991) ........................................66

*United States v. Perkins,* 470 F.3d 150 (4th Cir. 2006)....................................53, 54

*United States v. Perrotta,* 313 F.3d 33 (2d Cir. 2002)............................................48

*United States v. Pinson,* 860 F.3d 152 (4th Cir. 2017)............................................28

*United States v. Quigley,* 53 F.3d 909 (8th Cir. 1995) ..............................49, 50, 51

*United States v. Reed,* 780 F.3d 260 (4th Cir. 2015)..............................................47

*United States v. Robinson,* 627 F.3d 941 (4th Cir. 2010).......................................65

*United States v. Sands,* 899 F.2d 912 (10th Cir. 1990) ..........................................59

*United States v. Schiff,* 612 F.2d 73 (2d Cir. 1979) ................................................59

*United States v. Seeright,* 978 F.2d 842 (4th Cir. 1992)..........................................27

*United States v. Slager,* 2018 WL 445497 (D.S.C. Jan. 16, 2018).........................70

*United States v. Spagnolo,* 546 F.2d 1117 (4th Cir. 1976)......................................48

*United States v. Strieper*, 666 F.3d 288 (4th Cir. 2012) ..........................................27

*United States v. Street,* 548 F.3d 618 (8th Cir. 2008).......................................58, 59

*United States v. Taylor,* 754 F.3d 217 (4th Cir. 2014) ..............................48, 49, 50

*United States v. Vidacak*, 553 F.3d 344 (4th Cir. 2009).........................................26

*United States v. Volpe*, 78 F. Supp. 2d 76 (E.D.N.Y. 1999), ................................70
     *aff'd in part, dismissed in part*, 224 F.3d 72 (2d Cir. 2000)

*United States v. Wang,* 222 F.3d 234 (6th Cir. 2000)..............................................48

*United States v. White*, 850 F.3d 667 (4th Cir.),.....................................................68
     *cert. denied*, 137 S.Ct. 2252 (2017)

*United States v. Wolf,* 860 F.3d 175 (4th Cir. 2017) ........................................63, 64

*United States v. Wright,* 1987 WL 30617 (4th Cir. 1987) (unpublished)...............53

*Warfield v. State,* 315 Md. 474 (1989) ............................................................37, 43

*West v. State,* 312 Md. 197 (1988)........................................................................41

**STATUTES**

18 U.S.C. § 2 ........................................................................................................3

18 U.S.C. § 924(c) ...........................................................................................3, 4, 6

18 U.S.C. § 1343 ...............................................................................................3, 29

18 U.S.C. § 1951 ..................................................................................................3

18 U.S.C. § 1961(1)(A)-(B) ....................................................................................35

18 U.S.C. § 1962(c) ........................................................................................2, 3, 35

18 U.S.C. § 1962(d) ..........................................................................................2, 28

18 U.S.C. § 3553 ...............................................................................................27, 69

21 U.S.C. § 841 .....................................................................................................3

21 U.S.C. § 8446 ................................................................................3

Md. Code Ann. § 1-203 ....................................................................3

Md. Code Ann. § 3-402 ....................................................................3

Md. Code Ann. § 3-702 ....................................................................3

**RULES**

Fed. R. Evid. 403 ...........................................................................52

Fed. R. Evid. 701 ...........................................................................52

Fed. R. Evid. 704 ...........................................................................53

**SENTENCING GUIDELINES**

U.S.S.G. § 5k2.0 ............................................................................69

**OTHER AUTHORITIES**

Restatement (Second) of Agency (1958) ..........................................66

## JURISDICTIONAL STATEMENT

The district court possessed jurisdiction over this federal criminal case under 18 U.S.C. § 3231. It sentenced defendant Marcus Taylor ("Taylor") on June 7, 2018 and entered its written judgment on June 13, 2018. JA 1837-48. It sentenced defendant Daniel Hersl ("Hersl") on June 22, 2018 and entered its written judgment on June 26, 2018. JA 1849, 1942. Taylor and Hersl filed timely notices of appeal on June 13 and 28, 2018, respectively. JA 1849, 1942.

This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## ISSUES PRESENTED

1.  Should Count One be reversed because the government failed to prove beyond a reasonable doubt that use of interstate wires was foreseeable to any conspirator and therefore failed to prove any conspirator agreed to commit two racketeering acts?

2.  Should Count Two be reversed because the government failed to prove beyond a reasonable doubt that either defendant committed two racketeering acts?

3.  Should Counts Three and Five be reversed because the government failed to prove beyond a reasonable doubt that robberies were committed?

4.  Should Count Five be reversed because the government failed to prove beyond a reasonable doubt that the alleged robbery affected interstate commerce? [Hersl only]

5.  Did the district court abuse its discretion by denying defendants' motion in limine and subsequent objections to limit the government's use of the legal term "robbery"?

1

6.   Did the district court abuse its discretion by denying defendants' motion for mistrial following a lengthy, highly prejudicial outburst by government witness Ronald Hamilton?

7.   Did the district court abuse its discretion by denying the motion to dismiss or denying a continuance due to massive prejudicial pretrial publicity? [Taylor only]

8.   Did the district err by denying defendants' motion for new trial regarding *Brady* issues concerning government witness Antonio Santiful?

9.   Did the district court impose unreasonable sentences against the defendants?

## STATEMENT OF THE CASE

### I.   THE CHARGES

On February 23, 2017, a grand jury in the District of Maryland returned an indictment containing racketeering conspiracy and other charges against seven Baltimore City Police Department ("BPD") officers: Hersl, Taylor, Momodu Bondeva Kento Gondo ("Gondo"); Evodio Calles Hendrix ("Hendrix"); Wayne Earl Jenkins ("Jenkins"), Jemell Lamar Rayam ("Rayam"); and Maurice Kilpatrick Ward ("Ward"). JA 3, 22. All defendants were ordered detailed pending trial.

Gondo, Hendrix, Rayam, and Ward pleaded guilty to racketeering conspiracy, cooperated with the government and testified at trial. On June 22, 2017, the grand jury returned a superseding indictment against Hersl, Taylor, and Jenkins. JA 6, 27, 45-103. The superseding indictment charged the defendants with conspiring to violate the Racketeering Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d); racketeering, in violation of 18

2

U.S.C. § 1962(c); Hobbs Act robbery, in violation of 18 U.S.C. § 1951; possession of a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c); aiding and abetting, in violation of 18 U.S.C. § 2; and forfeiture allegations. Jenkins pleaded guilty but did not testify at trial.

Count One of the superseding indictment charged a RICO conspiracy in which the BPD constituted the RICO enterprise and included two specialized units, the Special Enforcement Section ("SES") and the Gun Trace Task Force ("GTTF"). It alleged that Hersl joined BPD in 1999 and was assigned to the GTTF not later than April 28, 2016, while Taylor joined the BPD in 2009, joined SES on October 5, 2015, and was assigned to GTTF on or about June 13, 2016.

Count One alleged that Hersl and Taylor participated in a racketeering conspiracy whose predicate offenses included wire fraud, in violation of 18 U.S.C. § 1343; robbery, attempted robbery, and conspiracy to commit robbery in violation of Maryland law, specifically Md. Code Ann., Crim. L. §§ 3-402 and 1-203; extortion, attempted extortion, and conspiracy to commit extortion by a government officer in violation of Maryland law, specifically Md. Code Ann., Crim. L. §§ 3-702 and 1-203; and conspiracy to distribute a controlled substance and distribution and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 and 841. The manner and means section of Count One alleged various forms of robbery, extortion, concealment and

misrepresentation, obstruction of justice, and financial fraud consisting of false and fraudulent time and attendance records used to obtain salary and overtime payments for times when the defendants did not work. Numerous overt acts tracked the racketeering acts set forth in Count Two.

Count Two charged the defendants with a substantive RICO violation, and set forth 22 racketeering acts related to many of the federal and state law violations cited in the conspiracy count.

Counts Three and Four charged Taylor with violating the Hobbs Act by committing the same robbery charged in Racketeering Act 8, and possessing a firearm in furtherance of that robbery. Counts Five and Six likewise charged Hersl with Hobbs Act robbery and a § 924(c) violation related to Racketeering Act 10.

## II.    RELEVANT PRETRIAL MOTIONS AND RULINGS

### A.    Pretrial Motions

Hersl filed a motion in limine prior to trial to preclude the Government and its witnesses from referring to alleged acts as robberies. JA 8 (ECF 225). The district court denied the motion "but with a caution." JA 160. The district court, prior to its ruling, said: "I certainly think that I can ask the Government to be restrained about that and not use that word [robbery] unnecessarily. *Id*.[1]

---

[1]    Additional details regarding the testimony and trial rulings on this issue are set forth in Section IV of the Argument.

Five days prior to trial, Taylor moved to dismiss the superseding indictment, or in the alternative, for a three-month continuance, because of prejudicial pretrial publicity. JA 165A-N. The district court proceeded to trial as scheduled.

### B. Motion for Mistrial

On the fifth day of trial, government witness Ronald Hamilton was being cross-examined by Taylor's counsel about mortgage payments on his house. Hamilton launched into a diatribe claiming that the defendants had destroyed his "whole fuckin' family." JA 1028-29. After Hamilton's testimony, the court recessed for the day. The following morning, Hersl and Taylor moved for a mistrial. JA 1036-40. The court denied the motions. JA 1041. Instead, the court gave a cautionary instruction. JA 1049.

### III. THE VERDICT AND JURY FINDINGS REGARDING RACKETEERING ACTS

After 12 days of trial, the jury returned a mixed verdict that included special verdict findings. With regard to the Count One RICO conspiracy, the jury found Hersl guilty but only identified two racketeering acts that Hersl or another member of the conspiracy agreed to commit: Racketeering Act 10, a robbery, and Racketeering Act 14, an overtime-related wire fraud. Similarly, the jury found Taylor guilty but only identified two racketeering acts: Racketeering Act 8, a robbery, and Racketeering Act 20, wire fraud. JA 1761-75.

On Count Two, the jury convicted both defendants. For Hersl, the special verdict form identified four robberies (Racketeering Acts 3, 4, 5, and 10) and four instances of overtime-related wire fraud (Racketeering Acts 14, 15, 18, and 21). For Taylor, it identified three robberies (Racketeering Acts 2, 8, and 12) and three instances of overtime-related wire fraud (Racketeering Acts 17, 20, and 22). The jury convicted both defendants of Hobbs Act charges but acquitted both of the § 924(c) charges.

Because the verdicts can only be sustained based on the racketeering acts that the jury found, the statement of facts below is limited to those incidents and necessary background and contextual information.

### A.     Racketeering Act 2: Shawn Whiting, Jan. 24, 2014 (Taylor)

On January 24, 2015, a squad of six BPD detectives, including Ward and Taylor, searched the residence of Shawn Whiting. JA 177-78. Testifying pursuant to a cooperation plea agreement, Ward stated that he was in charge of the Whiting case, had obtained a search warrant for Whiting's residence, and was responsible for the search. JA 173, 178, 182. The detectives found drugs, guns, and money. JA 180. When Taylor was searching the master bedroom closet, he found money. *Id.* Taylor immediately alerted the entire squad of his discovery and the money was seized. *Id.* Taylor did not take possession of the money, but Ward testified that Taylor had asked Ward to "look out for him." JA 181.

Officers took the drugs, guns and money to BPD's Western District, where they were photographed. JA 184-85. Some of the officers then took the drugs and guns to the Evidence Control Unit at BPD Headquarters. Ward, Taylor and Sgt. Ivery remained at the Western District with the money. JA 186. Ward left Taylor and Ivery with the money while he went to the booking computer.

When Ward returned to the locked room where the money was kept, Ivery and Taylor had left. Ward was alone in the room. JA 188-89. He testified that he thought that the pile of money looked smaller when he returned. JA 188. Ward took $3,000 from the pile and claimed that $1,500 was for himself and $1,500 was for Taylor. JA 189. He also claimed that later that day he gave Taylor $1,500, but was not sure where he did so. *Id.*

Whiting identified Taylor as being present during the search. Whiting claimed that the amounts of drugs and money reported as being seized from his residence were less than those that actually were seized, and further alleged that some personal items were missing after the search. Whiting did not testify that he directly saw Taylor take anything from his residence. JA 365-430.

### B.    Racketeering Act 3: Jimmie Griffin, Nov. 5, 2014 (Hersl)

Jimmie Griffin was arrested on November 5, 2014 and subsequently pleaded guilty to possession with intent to distribute 100 grams or more of heroin. JA 1106-07. Griffin acknowledged that at the time he was unemployed and earned his living selling drugs. JA 1108.

Griffin lived 3028 Pinewood Avenue in Baltimore City. JA 1109. On the day Griffin was arrested, BPD Detective Timothy Romeo was in the same squad as Hersl and was assisting him with an investigation on Pinewood Avenue. JA 1461. Hersl notified Romeo about a vehicle coming from a target residence on Pinewood with a nonfunctioning brake light. Romeo and other officers executed a traffic stop on a vehicle driven by George Lee. A K9 unit dog alerted on the vehicle, and police found $8,500 in cash and some sandwich bags with residue. JA 1463.

BPD obtained a search warrant for Griffin's residence and executed it at 4:00 or 4:30 p.m. Police seized a large quantity of heroin, paraphernalia, scales, a kilo press, and a red bandana consistent with affiliation with the Bloods gang. JA 1463-64.

After learning that Griffin was at another location, Romeo, Hersl, and other officers found him. Hersl arrested and searched him. JA 1466-67. Romeo saw Hersl remove money from Griffin's pocket, less than a large wad and nothing close

8

to $6,000. JA 1468. Romeo submitted an evidence form indicating that $900 was seized from Griffin and $4,003 was seized from the house. JA 1469.

Peter Iacovo, a former BPD detective, also participated in the search of Griffin's residence and was present when Hersl arrested Griffin. JA 1484-85. Hersl seized one or two gold chains from Griffin and gave the evidence to Iacovo, who submitted it. JA 1486-87.

Testifying with immunity and with hopes of reducing his sentence, Griffin claimed that as of November 5, 2014, he had $10,000 in a safe located in the house at 3028 Pinewood Avenue, and also possessed another $6,000 on his person. JA 1109, 1113, 1135. He took $5,000 of the $10,000, spent $3,000 to buy a car, spent $2,000 to buy four ounces of "weed," and returned $1,000 to the house. JA 1111-12. The $6,000 that Griffin had on his person supposedly came from his aunt, Samara Irby, who testified that she had given Griffin $6,500 from a lead paint poisoning settlement. JA 1104A-Q, 1113.

Griffin described going to smoke the weed at a friend's house, where police approached and asked for identification. Griffin gave a fake name. JA 1114. Griffin said that an officer who identified himself as Hersl handcuffed him and took his phone and money. JA 1116-17. Griffin claimed that Hersl took the entire $6,000 out of his pocket. JA 1117. The officers discussed conducting (but did not

conduct) a rectal exam, discussed the vehicles parked in back of the house, and took Griffin in a squad car to the police station. JA 1118-21.

When Griffin's mother retrieved his property, the property form stated that police had seized $900 from Griffin's person and $4,000 from his house, for a total of $4,903. JA 1122. Griffin said they actually took $6,000 from his person and $6,000 from the house, a discrepancy of $7,097. Griffin said that Hersl was armed but acknowledged that he consented to let Hersl search his person and home. JA 1123. Griffin was not present when his home was searched. JA 1139. Griffin further acknowledged repeatedly using a false name, selling drugs, and unlawfully possessing a firearm. JA 1124-27, 1134-42.

## C.    Racketeering Act 4: Herbert Tate, Nov. 27, 2015 (Hersl)

Herbert Tate, another admitted drug dealer, testified with immunity that on November 27, 2015, he was walking on Robb Street in Baltimore, where he grew up, and saw Hersl and two other officers approaching him from the rear. JA 765-70, 793.

Tate testified that he had finished his work as an HVAC technician and went to his old neighborhood to hang out with friends and kids from the basketball team he coached. JA 772. Tate claimed that Hersl grabbed him and started searching him. Tate had been paid that day and possessed about $530, a pay stub, a receipt from daycare, and perhaps another miscellaneous receipt. JA 777-78. During the

initial pat-down, Tate was not handcuffed, although he said he didn't think he could leave and was fearful. JA 779-80.

Hersl searched the street for a while and then told Tate he was being arrested. Sgt. Burns stated that the arrest was for "blue and whites," meaning heroin. JA 782-83. Tate denied selling heroin. JA 783. Officer Fassl, not Hersl, had the money from Tate's pocket, and Hersl instructed Fassl to retain it. JA 785. Sgt. Burns, not Hersl, declined Tate's request to count the money and said that he made more than $100,000 per year and didn't need Tate's money. JA 786. Tate claimed that his charge papers listed approximately $216 in seized funds, but that when he was released he had 37 cents in his pocket. *Id.* Tate claimed that no seized money was ever returned to him. JA 787. He also told a government agent that he had two $100 bills and that the rest of the money was $20 and $5 bills, but admitted that the evidence form showed $10 and $1 bills. JA 896-97. He also admitted providing a false address to the officers. JA 820-21.

A BPD sergeant who works in evidence control, Kimberly Swinton, testified that the paperwork for Tate's arrest listed Hersl as the arresting officer and showed the submission of $216 in currency. JA 1095-96.

### D.    Racketeering Act 5: Antonio Santiful, Nov. 28, 2014 (Hersl)

Antonio Santiful testified with immunity about an incident on November 28, 2015 in Baltimore. After previous convictions for possession of a firearm and

possession of drugs, in 2015 Santiful was working for a company cleaning commercial office buildings. JA 1050-53. Santiful said that on November 28, 2015, he parked his sister's car near Aiken Street and then met a friend named "Goo" Berger and played video games. JA 1043-54, 1065. When initially interviewed by investigators, Santiful said he was in the neighborhood to meet a girl. JA 1068. An unmarked police car pulled up and four officers jumped out. Some people were allowed to leave, but Santiful was handcuffed and searched. JA 1055-56. Sgt. Burns searched Santiful but did not retrieve the car keys that were in his pocket. Hersl then approached, re-searched Santiful, and took the keys. JA 1056-57. Hersl asked where the car was. When Santiful answered that he didn't know, Hersl left. JA 1057.

After about an hour-and-a-half, Santiful was placed in a paddy wagon and taken to the district station. JA 1059. He was charged with narcotics and firearms offenses, which were later dropped. JA 1061. At the station, Hersl checked Santiful's pockets and took $700 in cash that Santiful had earned from work. 1056-57, 1059. When Santiful was released, he received 65 cents, but never got his $700 back. JA 1062. Police paperwork stated that $218 had been seized from Santiful, but he never tried to get it back. JA 1063-64. As a result of allegedly losing $700, Santiful was unable to retrieve his car from an impound lot. As a result of Hersl seizing his sister's keys, she had to buy new keys for her vehicle

and retrieve it from the impound lot. JA 1063. A BPD contractor working in evidence control confirmed that the arresting officer in Santiful's case was J. Burns and that $218 was submitted. JA 1088-89.

### E. Racketeering Act 12 and Count Three: Oreese Stevenson, Mar. 22, 2016 (Taylor)

On March 22, 2016, Oreese Stevenson and another man were sitting in a minivan parked on a street right off of Northern Parkway in Baltimore City. JA 478-49. Hendrix, testified that he, Jenkins, Ward and Taylor were driving when they noticed Stevenson's vehicle. JA 479. Although Hendrix said that he did not observe Stevenson or his passenger doing anything illegal, Jenkins stopped the vehicle. *Id.* Ward testified that "Jenkins had this thing where anytime somebody over 18 had a book bag, a grown man with a book bag, he always thought it was concealed weapons or drugs. So he always wanted to stop 'em and check it out." JA 225. Ward also said that they had seen Stevenson's passenger coming out of a house with a book bag and then getting into the van. JA 226.

After the Jenkins group had blocked Stevenson's minivan, Ward opened the back of the vehicle. JA 227. Ward opened a book bag sitting in the back seat, located cocaine, and alerted Jenkins and Hendrix. *Id.* When Stevenson and his passenger got out of the van they were handcuffed. *Id.* Jenkins then took Stevenson's keys from him. JA 228. Stevenson and his passenger were arrested, placed in a transport vehicle and sent to Central Booking. Taylor and Hendrix

13

properly submitted the cocaine and money that had been seized from the van. JA 252.

Ward, Hendrix, Jenkins and Taylor proceeded to one of the addresses that they had for Stevenson and used his keys to enter, but found the house to be largely empty. JA 230-31. They proceeded to an address in northeast Baltimore, which turned out to be Stevenson's primary residence. JA 233. Jenkins wanted to do a "sneak-and-peek" warrantless search of the house. *Id.*

Jenkins had intended to use Stevenson's key to enter the house, but noticed a neighbor was in front of the house. JA 234. As an alternative plan, Jenkins told Taylor to go around the back of the house and pretend he was chasing someone who was coming out of the house, creating the appearance of an exigent circumstances that would permit the officers to enter the house and hold it until they could obtain a search warrant. *Id.* The officers then used Stevenson's keys to enter the house, where they found kilos of cocaine in the basement, as well as a safe. JA 236. Before anyone attempted to open the safe, Jenkins, Hendrix and Taylor left the house to obtain a search warrant. JA 237.

When the officers returned several hours later with the warrant, they pried open the safe with a bar and found money, which Jenkins took. JA 242. He returned $100,000 to the safe and put the rest of the money in a bag. The officers

then closed the safe and re-enacted popping open the door. Taylor recorded the re-enactment with his cellphone. JA 248.

Several hours later Ward, Hendrix and Jenkins went to Taylor's house. JA 252. Jenkins dumped out the bag of money and divided up the funds. Ward testified that Jenkins gave each of the other men approximately $20,000. JA 253. Jenkins kept the rest of the money. *Id.*

### F.    Racketeering Act 10 and Count Five: Ronald and Nancy Hamilton, July 8, 2016 (Hersl)

Ronald Hamilton testified under grant of immunity about events that took place on July 8, 2016. Hamilton said that he sold cars and had an assisted living business, but also had served prison sentences following felony narcotics conspiracy convictions in 2001 and 2010. JA 918-20. After his release, Hamilton did construction work, sold cars, and gambled four or five times a week at casinos. JA 921.

Hamilton claimed that on July 8, 2016, he and his wife went to a Home Depot on Reisterstown Road to buy materials for renovating a house he had recently purchased in Westminster, Maryland, which is located northwest of Baltimore City in Carroll County. JA 924. Hamilton was shopping for construction materials and for blinds. Hamilton said he noticed "Detective Raymond" – presumably Rayam – staring at him. JA 926. After Hamilton paid for his purchases, he and his wife went to their car and drove to another shopping center.

15

He said that immediately "the cops jumped out with guns" and yelled at him to "Get out the car." JA 927. Rayam yelled "Where your money at?" and took approximately $3,400 out of Hamilton's pocket, then stuck it in the officer's vest. JA 927-28, 956, 983-84. Three police cars with a total of six or seven officers were present. JA 928.

Hamilton and his wife were handcuffed and taken to a barrack station on Northern Parkway in Baltimore City. JA 928. At the station, Jenkins pretended to be a federal agent and claimed that they had evidence of Hamilton conducting controlled buys of drugs. JA 930, 933.

Hamilton said that Jenkins was present with "Raymans" (presumably Rayam), "Gumbo" (presumably Gondo) and Hersl. JA 931. Hamilton said Hersl was present but didn't talk at all. JA 937. Rayam confirmed that "Hersl was there, but he was pretty much in and out of the office where we was talking to 'em." JA 595. Gondo testified about the "debriefing" of Hamilton but did not describe anything that Hersl did. JA 1166-68. Hamilton testified that Jenkins asked if Hamilton had money at his house. Hamilton said yes but did not disclose the amount. JA 932. The officers put Hamilton and his wife in a car and said they were taking them to their house. *Id.*

When they arrived at Hamiltons' house, "Raymans" and Jenkins entered the house while Hersl stayed outside, near the car in which Hamilton was sitting.

JA 935, 987-88. Still handcuffed, Hamilton was taken inside. Hamilton and his wife sat in the living room. Hersl sat in a chair and watched them, JA 937-38, which Rayam testified was proper police protocol. JA 697. Other officers searched the house. JA 938. Hamilton also said he stored bundles of cash, representing the proceeds of car sales and casino winnings, in heat-sealed bags in his bedroom. JA 945-47.

Rayam testified that he, Gondo and Hersl were in the bedroom, where money was found. Gondo counted $20,000. JA 598. Gondo confirmed that they located a block of $50,000 in a Ziploc bag and $20,000 in loose $100 bills. JA 1173. Hersl saw the loose money. JA 1174-75. Jenkins told Rayam to take the money. JA 599. Rayam mentioned this to Gondo and Hersl, who didn't say anything more than "Okay, whatever." JA 599-600. Gondo said that Rayam brought the money to a BPD car. JA 1179.

Because they were operating out of their jurisdiction, the BPD officers called the Maryland State Police, who did an additional search of the house. JA 938-40. The non-BPD officers seized the remaining cash. JA 601. Hamilton testified that when an officer told him they had found money, and tried to get Hamilton to sign a blank form, Hamilton refused because he had allegedly possessed $75,000 and the form did not have a dollar figure on it. JA 940. He said the police would not put down an amount. *Id*. After the second group of officers

left, Hamilton's handcuffs were removed. JA 941. Hamilton said he thought that if he had resisted, he would have been beaten up. *Id*.

Jenkins asked whether Hamilton knew of other "bigwigs" that could be robbed. JA 601. Hersl was present but no witness testified that he said or did anything. JA 602.

Later, the officers split up the money, with Jenkins being given what was supposedly Hersl's portion, but came up $3,000 short. JA 603, 1184-86. Rayam and Gondo suspected Hersl, who had been in the bedroom with the money before Jenkins authorized the theft, but no one confronted him. JA 604-05.

The following day, Hamilton called Carroll County concerning his money and was told that $50,000 had been seized. JA 943. A forfeiture notice stated the same amount. JA 944. Including the amount allegedly taken from his pocket, Hamilton said that $78,400 was actually taken. *Id*. Hamilton said his watch was also taken. JA 957-58. Hamilton said he had no interactions with Taylor. JA 998.

During cross-examination by Taylor's counsel, Taylor, Hamilton launched into a profanity-laced tirade about how the arrest and search had "destroyed my whole fuckin' family." JA 1028-30.[2]

---

[2]    Additional details regarding Hamilton's outburst and the district court's ruling denying defendants' motion for a mistrial are set forth in Section V of the Argument.

### G.    Racketeering Act 12: Sergio Summerville, Sept. 7, 2016 (Taylor)

Rayam testified that he, Gondo and Taylor observed a vehicle pulling out of a commercial storage unit facility. JA 612. Sergio Summerville, a then-homeless drug dealer, had just left his storage unit. JA 881-83. Gondo blocked Summerville's vehicle and ultimately found out from the facility's on-site attendant where Summerville's unit was located. At some point in the encounter with Summerville, his keys were taken. JA 891. Rayam and Taylor went into the unit. Rayam found drugs and cash in a sock. Rayam testified that he gave Taylor a small sum of money – his testimony varied as to the amount from $20 to $60. JA 613-14. Rayam returned the sock to Summerville, who said it was lighter than it had been. JA 894.

### H.    Racketeering Acts 14, 15, 18, 20, 21 (Hersl), 17, 20, 22 (Taylor)

Ward, Gondo, Hendrix, and Rayam testified that they – as well as Hersl and Taylor – routinely caused the submission of documents which sought overtime pay for hours they had not worked. An FBI agent provided summary testimony regarding times when conspirators allegedly requested and received allegedly improper overtime pay. JA 1339-1451. Although the Government presented testimony as to how payroll was processed by BPD and its contractor through the use of interstate wires, it presented no testimony that any conspirator, including

Taylor or Hersl, knew that the overtime was processed in a manner that utilized the wires.[3]

## IV. MOTIONS FOR NEW TRIAL AND SENTENCING PROCEEDINGS

After the jury verdict, a federal grand jury in the District of Maryland returned an indictment charging government witness Antonio Santiful and others with conspiring to distribute cocaine base. *United States v. O'Cain et. al,* 1:18-cr-00278-CCB (D. Md. filed May 8, 2018) (Dkt. 1). The *Santiful* indictment, handled by the same U.S. Attorney's Office that prosecuted Hersl and Taylor, alleged Santiful's involvement in a conspiracy that began in 2017, two months prior to Santiful's testimony in this case, and alleged that he possessed narcotics with intent to distribute on March 9 and March 15, 2018, less than two months after his testimony. At the time of Santiful's testimony, the government disclosed nothing about its ongoing investigation into Santiful's ongoing illegal activity.

Both defendants moved for a new trial based on a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The motions alleged that during the trial the government portrayed Santiful as a hard-working man while failing to disclose that he was under investigation as an active drug dealer. JA 1176-93. The

---

[3]     Additional details regarding payroll and overtime issues are set forth in Section I of the Argument.

district court heard argument on the motions prior to each sentencing hearing, and on each occasion denied the motions. JA 1796-99 (Taylor), 1875-78 (Hersl).[4]

On June 7, 2018, the district court sentenced Taylor to concurrent terms of 216 months of imprisonment on each count of conviction, to be followed by a three-year period of supervised release. JA 1837-40 (pronouncement of sentence), 1843-48 (judgment). On June 22, 2018, it imposed the same sentence on Hersl. JA 1929-33 (pronouncement of sentence), 1936-39 (judgment).[5]

## SUMMARY OF ARGUMENT

Beginning in 2011, a number of officers assigned to two BPD specialized units crossed the line from law enforcers to lawbreakers. By their own admission, during their assignments to the SES and GTTF, Gondo, Hendrix, Jenkins, Rayam, and Ward used their police power to steal money and property from residents of Baltimore City and neighboring jurisdictions, to steal drugs from narcotics dealers and resell those drugs for their own profit, and to steal money from the taxpayers of Baltimore City by fraudulently awarding themselves vast quantities of overtime pay to which they were not entitled. For these serious crimes, Gondo, Hendrix, Jenkins, Rayam and Ward received lengthy sentences in federal prison.

---

[4]     Additional details regarding the motions are set forth in Section VII of the Argument.

[5]     Additional details regarding the sentencing proceedings are set forth in Section VIII of the Argument.

Hersl and Taylor were caught up in the investigation of the convicted officers, but maintained their innocence and stood trial. The jury returned a split verdict, convicting both defendants of racketeering conspiracy and racketeering but finding a limited number of predicate racketeering acts, and convicting both defendants of Hobbs Act violations while acquitting them of using their police weapons to commit those offenses.

In fact, however, while the government proved that Hersl and Taylor were present at, and sometimes participated in, improper police conduct, it did not prove any of the federal crimes charged in the superseding indictment.

First, for the racketeering acts involving the predicate offense of wire fraud, the government never even tried to prove that the use of the wires was reasonably foreseeable to a defendant or coconspirator in the execution of the alleged overtime fraud scheme. While the government proved that BPD paid overtime to its officers through a payroll processing system that utilized the interstate wires, it offered literally no evidence to prove that the use of the wires was foreseeable to Hersl, Taylor, or other conspirators. Such evidence falls far short of foreseeability requirements this Court recently stated in *United States v. Burfoot,* 899 F.3d 326 (4th Cir. 2018). As a result, the wire fraud racketeering acts cannot stand, and the RICO conspiracy convictions on Count One must be reversed because the jury did not find two racketeering acts committed in furtherance of the conspiracy.

The wire fraud racketeering acts must also be disregarded with respect to the substantive RICO charge in Count Two. Additionally, the evidence was insufficient to support the jury finding that each defendant participated in multiple acts constituting state law robbery and/or robbery conspiracy offenses. Under Maryland law, robbery is the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear. Guilt requires that a defendant be a principal or an accomplice, but a conviction cannot rest on mere presence at the place where a crime has been committed. For each racketeering act found by the jury on Count Two, the government failed to prove that Hersl and Taylor, respectively, committed or conspired to commit all of the elements of robbery under Maryland law.

Similarly, the government failed to prove the Hobbs Act charges against Taylor (Count Three) and Hersl (Count Five). For the same reasons that the government's proof of the state law robbery was defective, it also failed to prove that the defendants' conduct constituted coerced taking of property within the meaning of the federal statute. In Hersl's case, the Hobbs Act charge contains an additional fatal defect: the government failed to prove the facts necessary to establish federal jurisdiction. To satisfy the interstate commerce component of a Hobbs Act robbery charge, the government must prove at least a "minimal" effect on interstate commerce. In the incident that gave rise to Count Five, officers

initially stopped Ronald Hamilton and his wife while they were shopping at a
Home Depot for items for their home. Officers other than Hersl stole
approximately $3,400 from Hamilton's shirt and $25,000 from his home. Stealing
money from a private individual in a private car shopping for construction products
for his private house, and then stealing personal savings kept in that private house,
did not obstruct interstate commerce.

In addition to the government's failures of proof, the district court
committed reversible error with regard to several significant issues. First, because
of the significance of the distinction between robbery (which is a RICO predicate)
and theft (which is not), defendants moved *in limine* to preclude the government
from referring to acts committed by its cooperating witnesses as robberies. The
district court denied the motion and declined to "impose a blanket prohibition" on
use of the term robbery, but cautioned the government to be "restrained" and not
use the word robbery "unnecessarily." The district court's failure to rein in the
government had disastrous consequences for Hersl and Taylor. Cooperating
codefendant police officers (Gondo, Hendrix, Rayam, and Ward) used the term
"rob" incessantly. Far too late, the district court attempted to rein in the
government's use of the word, yet the government continued to ask questions and
elicit answers using the words rob, robbing, and robbery. Not only was such
language highly inflammatory, its use by police officers constituted impermissible

lay opinion testimony that stated a legal standard and drew a legal conclusion. The testimony from the former officers was quintessential improper expert testimony dressed in lay witness clothing.

Just as the former officers poisoned the well with their testimony, so did one of the victims, Ronald Hamilton. During cross-examination, Hamilton launched into a rant against the BPD officers, shouting repeatedly that "this right here destroyed my whole fuckin' family." The following day, defendants moved for a mistrial, accurately characterizing Hamilton's screed as "a bell that … cannot be unrung." The district court agreed that Hamilton's statements were an "outburst" but denied the mistrial motion and instead struck Hamilton's statement and gave a curative instruction. Delivered long after Hamilton's words had implanted themselves in the jurors' minds, the attempted curative measure was ineffectual. Failure to grant a mistrial was reversible error.

In addition to these issues, Taylor challenges the district court's denial of his motion to dismiss, or in the alternative for a continuance, because of prejudicial pretrial publicity. Both defendants challenge the district court's denial of their motions for a new trial, which were predicated on the U.S. Attorney's Office's failure to disclose its ongoing narcotics conspiracy investigation of one of its star witnesses, Antonio Santiful, who was indicted shortly after he testified and shortly after the jury verdict against Hersl and Taylor.

Finally, the district court's sentences were substantively unreasonable. In both cases, the court imposed within-guidelines sentences that failed to adequately consider their vulnerability as incarcerated police officers, acceptance of responsibility, and prior contributions to the community, and family circumstances. Local police officers incarcerated in the federal prison system are susceptible to abuse and may encounter individuals they helped to incarcerate. Hersl and Taylor should have received a significantly reduced sentences to take these circumstances into account.

## STANDARDS OF REVIEW

**Sufficiency of the evidence:** This Court reviews the sufficiency of the evidence to determine whether, viewing the evidence in the light most favorable to the government, no "rational trier of fact could have found" that all elements of the charged offense were proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

**Evidentiary rulings:** This Court reviews decisions to admit evidence for abuse of discretion. *United States v. Vidacak*, 553 F.3d 344, 348 (4th Cir. 2009) (internal quotation marks omitted). Judgments may be reversed if the district "court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *Id.* (internal quotation marks omitted).

**Mistrial motion:** This Court reviews the district court's denial of a mistrial for abuse of discretion. *United States v. Dorlouis,* 107 F.3d 248, 257 (4th Cir.1997). An abuse of discretion requires that a defendant have experienced prejudice. Reversal is required if there is a clear abuse of discretion and a "reasonable possibility that the jury's verdict was influenced by the material that improperly came before it." *United States v. Seeright,* 978 F.2d 842, 849 (4th Cir. 1992) (internal citation and quotation marks omitted).

***Brady* Violation:** The district court's legal determination of whether there was a *Brady* violation is reviewed *de novo*, while any factual findings on that issue are reviewed for clear error. *United States v. Bartko*, 728 F.3d 327 (4th Cir. 2013).

**Sentencing:** This Court reviews sentences imposed pursuant to 18 U.S.C. § 3553 for substantive reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 41 2007). Reasonableness "largely depend[s] upon the specific facts of each case and the district court's consideration and application of the § 3553(a) factors to those facts." *United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006). A sentence within the Sentencing Guidelines sentence is presumptively reasonable. *United States v. Strieper*, 666 F.3d 288, 295 (4th Cir. 2012).

# ARGUMENT

**I.    COUNT ONE SHOULD BE REVERSED BECAUSE THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT USE OF INTERSTATE WIRES WAS FORESEEABLE TO ANY CONSPIRATOR AND THEREFORE FAILED TO PROVE ANY CONSPIRATOR AGREED TO COMMIT TWO RACKETEERING ACTS**

To prove an offense under the RICO conspiracy provision, 18 U.S.C. § 1962(d), the government must prove the existence of a RICO "enterprise" in which the defendant conspired to participate, and that the defendant conspired that a member of the enterprise would perform at least two racketeering acts constituting a "pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997); *United States v. Pinson,* 860 F.3d 152, 161 (4th Cir. 2017). "Although such 'conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part' of a racketeering act, each conspirator must share 'the same criminal objective.'" *Pinson,* 860 F.3d at 161 (quoting *Salinas*, 522 U.S. at 63–64). The district court correctly instructed the jury on these requirements. JA 1514-20.

The jury found the minimum of two racketeering acts for each defendant: for Hersl, Racketeering Acts 10 (July 8, 2016 incident involving the Hamiltons) and 14 (July 6, 2016 interstate wire); for Taylor, Racketeering Acts 8 (March 22, 2016 incident involving Oreese Stevenson) and 20 (August 3, 2016 interstate wire).

Defendants do not challenge that there was sufficient evidence for the jury to find that other conspirators agreed to the racketeering acts involving the Hamiltons and Stevenson. But Count One must be nevertheless reversed, because there was no evidence that any member of the conspiracy could have agreed to commit wire fraud.

The wire fraud statute, 18 U.S.C. § 1343, provides in pertinent part that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … in interstate … commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" is guilty of a crime. The government was required to prove that the defendant (1) devised or intended to devise a scheme to defraud, and (2) used the wire communications in furtherance of the scheme. *United States v. Jefferson,* 674 F.3d 332, 366 (4th Cir. 2012). Critical for present purposes is that while the government need not prove that a defendant specifically caused the use of the interstate wires, it must prove beyond a reasonable doubt that the use of interstate wires was reasonably foreseeable to a defendant in the execution of the scheme. *See Pereira v. United States,* 347 U.S. 1, 8-9 (1954); *United States v. Loayza,* 107 F.3d 257, 265 (4th Cir.

1997). The district court correctly charged the jury as to these elements. JA 1540-48.

Racketeering Acts 14 and 20 charged that the overtime fraud constituted a scheme to defraud that was executed for particular pay periods by "an interstate electronic wire between BPD, in Baltimore, Maryland, and ADP, the company that manages the BPD's payroll…." JA 97. The government proved without dispute that the process leading to paying overtime to BPD officers involved the use of interstate wires. But it offered literally no evidence to prove that the use of the wires was foreseeable to Hersl, Taylor, or other conspirators.

Lt. Theodore Friel of BPD's human resources department testified as to the periods that Hersl and Taylor were employed by BPD. JA 432-34. BPD's director of fiscal services, Elaine Harder, testified that BPD used ADP to manage its time and attendance and payroll functions. She described the process through which an overtime slip was submitted to the unit's timekeeper, who entered the information into a "eTime" time and attendance system. After review, the payroll went to the fiscal services unit, and then to central payroll for processing. JA 436-37. Harder testified that most employees were paid through an electronic funds transfer, *id.* at 438, but did not testify whether Hersl, Taylor, or any other conspirator was paid by such a transfer or by a paper paycheck. Nor did she – or any other witness – testify that the defendants, coconspirators, or any other BPD employees were aware that

30

funds moved electronically between BPD and ADP, the wires referenced in Racketeering Acts 14 and 20.

Christopher Matz, ADP's vice president of client services, testified that when time and attendance information was uploaded to ADP by its client, BPD, the information was transmitted to servers in Sioux Falls, South Dakota. JA 441-42. Like Harder, Matz offered no testimony that BPD employees were aware of these wire communications.

As a result, the government failed to prove that it was reasonably foreseeable to Hersl, Taylor, or any other conspirator that the submission of allegedly fraudulent overtime slips would lead to the use of interstate wires. This Court summarized those foreseeability requirements in *United States v. Burfoot*, 899 F.3d 326 (4th Cir. 2018), where the defendant was a city councilor in Norfolk, Virginia who solicited bribes from real estate developers. To prove foreseeability, prosecutors "offered testimony and evidence about Burfoot's familiarity with the Treasurer's office (he was, in fact, the Chief Deputy Treasurer) and how the office routinely accepted credit card payments for tax obligations." *Id.* at 335. They also proved that Burfoot was personally involved in demanding payment of a tax delinquency that included a credit card payment. *Id.* "Given all this evidence, a reasonable jury could conclude that it was reasonably foreseeable that [a developer] would use an interstate wire transfer in response to Burfoot's demand

31

that he quickly pay [his firm]'s delinquent taxes." *Id.* at 336; *accord United States v. Bermes,* 9 F. App'x 207, 210 (4th Cir. 2001) (evidence proved defendant with office in Tennessee knew that money he caused investor to deposit in South Carolina would be moved via interstate wire).

No such evidence was presented about Hersl, Taylor, or coconspirators. To the contrary, the proof in this case closely resembles cases where wire fraud convictions were reversed for failure to prove foreseeability.

In *United States v. Bentz,* 21 F.3d 37 (3d Cir. 1994), defendant Ross was charged with wire fraud in connection with false representations about scrap metal he delivered to a broker in Pennsylvania that led to computer transmissions to New York and then to checks generated in New York. The government acknowledged that it had failed to prove that Ross knew the broker used wire transmissions in the ordinary course of its business. Ross testified that he had no such knowledge. And the Third Circuit found that nothing in the record supported an inference of knowledge. *Id.* at 41. Accordingly, it reversed Ross's wire fraud convictions:

> Reasonable foreseeability, on the other hand, marks the territory between "but for" causation and actual knowledge of causation. The government admitted during oral argument that there was not much evidence supporting this theory. We conclude that the objective standard of reasonable foreseeability is not supported by the record. Although "[t]he content of reasonable foreseeability must inevitably keep pace with advances in technology and general awareness of such advances," … use of the wire by a scrap metal storage facility in Pennsylvania which issues checks drawn on a Pennsylvania bank is not self-evident. Nor is there sufficient evidence for us to conclude

> that Ross should reasonably have anticipated that [the broker] made
> wire transmissions when preparing his checks.

*Id.* at 41 (citation and footnote omitted). *See also United States v. Lothian,* 976
F.2d 1257, 1265 (9th Cir. 1992) (reversing wire fraud convictions because wire
transmissions made after defendant's withdrawal from scheme were not
foreseeable to him).

Also illustrative is the Fifth Circuit's original panel opinion in *United States
v. Brumley,* 59 F.3d 517 (5th Cir. 1995), *opinion withdrawn and superseded on
reh'g,* 79 F.3d 1430, 1432 (5th Cir. 1996), *opinion vacated and reh'g en banc
granted,* 91 F.3d 676 (5th Cir. 1996), *aff'd en banc,* 116 F.3d 728 (5th Cir. 1997).
In *Brumley,* the defendant was involved in allegedly fraudulent wire transfers from
Lufkin, Texas to Beaumont, Texas. Unbeknownst to him, the wire transfer process
included communications to a Western Union computer in Missouri. 59 F.3d at
519. The Fifth Circuit noted that "the government did not seek to put on evidence
showing foreseeability." *Id.* at 521. Rather, the only evidence supporting
foreseeability was that Western Union was an international company with agents
throughout the United States, and that the form Brumley's attorney, Cely, used to
initiate the transfer of funds listed a Western Union corporate address in New
Jersey. *Id.* The Fifth Circuit found that evidence inadequate to prove wire fraud:

> There is not sufficient evidence in this record upon which a trier of
> fact could find *beyond a reasonable doubt* that it was foreseeable to
> Brumley or Cely that their actions would cause the Western Union

> agents to make interstate wire communications. Because use of
> interstate wire communications is an essential element of the offense,
> … the evidence at trial was insufficient for the court to find Brumley
> guilty of wire fraud.

*Id.* at 522 (emphasis in original). While the panel opinion was later withdrawn so
that the Court could address threshold questions about whether a scheme to
defraud even existed, the panel's foreseeability analysis is on all fours with *Bentz*
and *Burfoot.*

Here, the government introduced no evidence whatsoever that it was
reasonably foreseeable to Hersl, Taylor, or coconspirators that the submission of
overtime slips would lead to wire communications between BPD and ADP, let
alone interstate wire transmissions from Maryland to South Dakota. The record at
trial proved no more than that defendants lived in Maryland, worked in Maryland,
caused overtime slips to be submitted in Maryland, and were paid as employees of
BPD. The record does not prove whether either defendant or any coconspirator was
paid by wire transfer from ADP to their bank – transfers that, in any event, were
not the wire transmissions charged in the wire fraud racketeering acts.

In the brief fragment of its closing argument devoted to the elements of wire
fraud, the government stated merely that "[a]s far as the interstate wire, you heard
from Mr. Matz. He flew into Baltimore all the way from Atlanta, Georgia.
Testified that ADP's data center is in Sioux Falls, South Dakota. That element is
met." JA 1602. Under *Burfoot,* and for the reasons outlined above, more than this

34

was required, but not proven. As a result, the jury's findings regarding Racketeering Acts 14 and 20 must fall, leaving just one racketeering act per defendant. Because the law requires two, the defendants' RICO conspiracy convictions must be reversed.

### II. COUNT TWO SHOULD BE REVERSED BECAUSE THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT EITHER DEFENDANT COMMITTED TWO RACKETEERING ACTS

A defendant's guilt on a charge of violating § 1962(c) is established by showing: (1) the existence of an enterprise; (2) the defendant's association with the enterprise; (3) the defendant's participation in the affairs of the enterprise; (4) a pattern of racketeering activity; and (5) the enterprise's effect on interstate commerce. *United States v. Hooker,* 841 F.2d 1225, 1227 (4th Cir.1988) (en banc). "Racketeering activity" is defined as "any act or threat" involving specified crimes under state law punishable by imprisonment for more than one year or "any act [that] is indictable" under various federal criminal statutes, including the wire fraud statute. 18 U.S.C. § 1961(1)(A)–(B).

For a "pattern" of such activity to be present, there must be proof that the defendant committed at least two racketeering acts within a ten-year period. *Id.* § 1961(5). The district court correctly instructed the jury as to these elements. JA 1520-48.

35

> **A.     The Evidence Was Insufficient to Prove That Hersl Committed Wire Fraud or Committed or Conspired to Commit Robberies**

The jury convicted Hersl on Count Two by finding that he engaged in four substantive acts or robbery and/or robbery conspiracy (Racketeering Acts 3, 4, 5, and 10) and four acts of wire fraud (Racketeering Acts 14, 15, 18, 21). The jury found that the government had not proved Racketeering Act 11 (Armstrongs).

> **1.     The Government Fails to Prove Hersl Committed Wire Fraud in Racketeering Acts 14, 15, 18, and 21**

For the reasons set forth in Section I, the Court should set aside the jury's finding that Hersl committed four acts of wire fraud.

> **2.     The Government Failed to Prove Hersl Committed Robbery in Racketeering Act 3 (Griffin)**

Under Maryland law, robbery is defined as "the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear." *Hall v. State*, 233 Md. App. 118, 138 (2017) (quoting *Metheny v. State*, 359 Md. 576, 605 (2000)); *Coles v. State,* 374 Md. 114, 123 (2003). Put another way, robbery is "a larceny from the person accomplished by either an assault (putting in fear) or a battery (violence)." *Snowden v. State*, 321 Md. 612, 618 (1991). The assault can be second-degree assault. *Morris v. State*, 192 Md. App. 1, 33 (2010).

Where several persons are present at an alleged robbery, an individual is only guilty if he or she is a principal or an accomplice. Guilt cannot be predicated on mere presence. *Warfield v. State,* 315 Md. 474, 491 (1989) ("[P]resence, alone, at the place where a crime has been committed is not sufficient to establish participation in the perpetration of the crime.") (internal citation and quotation marks omitted). Maryland law requires that "'to be an accomplice a person must participate in the commission of a crime knowingly, voluntarily, and with common criminal intent with the principal offender, or must in some way advocate or encourage the commission of the crime.'" *Silva v. State,* 422 Md. 17, 28 (2011) (quoting *State v. Raines,* 326 Md. 582, 597 (1992)). "'[T]he mere fact that a person witnesses a crime and makes no objection to its commission, and does not notify the police, does not make him a participant in the crime.'" *Id.* (alteration in original) (quoting *State v. Foster,* 263 Md. 388, 394 (1971)). Presence must be coupled by aiding and abetting. "[T]he person must actually participate by 'assist[ing], support[ing] or supplement[ing] the efforts of another,' or, if not actively participating, then the person must be present and 'advise or encourage the commission of a crime' to be considered an accomplice." *Id.* (alterations in original) (quoting *Foster,* 263 Md. at 393).

* * *

As discussed above, Racketeering Act 3 involved the arrest of heroin dealer Jimmie Griffin on November 5, 2014. Hersl and BPD Detective Romeo were investigating drug dealing on Pinewood Avenue in Baltimore, where Griffin lived. Officers executed a traffic stop on a vehicle driven by George Lee, leading to the discovery of $8,500 in cash and sandwich bags with residue. Pursuant to a warrant, heroin, paraphernalia, scales, a kilo press, and evidence of gang affiliation were seized from Griffin's house and Hersl arrested and searched him. Romeo submitted an evidence form indicating that $900 was seized from Griffin and $4,003 was seized from the house.

Griffin claimed that he had $10,000 in a safe located in his house and $6,000 on his person. After buying a car and marijuana, Griffin went to a friend's house to smoke the marijuana. He gave police a fake name. He claimed that an officer who identified himself as Hersl handcuffed him and took his phone and $6,000 out of his pocket, but acknowledged that he consented to let Hersl search his person and home, and further acknowledged that he was not present when his home was searched.

In closing argument, the government recognized that Griffin's consent undermined any claim that Hersl committed robbery. Instead, the government focused on extortion, with AUSA Hines stating:

> So for Racketeering Act 3, Jimmie Griffin did testify that he consented. And the Government has proven beyond a reasonable

38

doubt that Mr. Griffin committed extortion – or was the victim of extortion by Mr. Hersl and that the extortion involved the wrongful use and threatened force of violence and extortion under color and pretense of office.

JA 1583.

The jury, however, found that Hersl committed robbery, not extortion. That finding cannot stand under Maryland law. Griffin's acknowledgement that he consented to the police officers' actions, ratified by the prosecutor, fatally undermines the jury's finding. The specific intent offense of robbery requires taking property without the owner's consent. *Leeson v. State,* 293 Md. 425, 435 (1982). As the Maryland Court of Appeals has stated, "there can be no robbery without a larcenous intent," while larceny in turn requires an absence of consent from the victim. *Hook v. State,* 315 Md. 25, 30-31 (1989); *State v. Gower,* 267 Md. 602, 606 (1973).

### 3. The Government Failed to Prove Hersl Committed Robbery in Racketeering Act 4 (Tate)

In his immunized and uncorroborated testimony about the events of November 27, 2015, Herbert Tate said that while he did not think he could leave and was fearful, Hersl did not handcuff or point a gun at him. Officer Fassl, not Hersl, took money from Tate's pocket, and Hersl did not take the money from Fassl to retain it. Sgt. Burns, not Hersl, declined Tate's request to count the money. Tate admitted providing a false address to the officers, and that his recollection that

he had two $100 bills and some $20 and $5 bills was inconsistent with an evidence form that showed $10 and $1 bills.

These facts demonstrate that Hersl was neither a principal nor an accomplice to a robbery. Even if Hersl placed Tate in fear, he did not feloniously take and carry away his property or help anyone else to do so. Hersl did not take money off of Tate's person; Fassl did. Hersl did not deny Tate's request that the money be counted; Burns did. Neither Fassl nor Burns testified. No witness supported the government's contention that at some point between Fassl searching Tate and Burns submitting the evidence control form, Hersl stole money. No evidence demonstrated that Fassl or Burns was a principal offender in a robbery, precluding any claim that Hersl shared "common criminal intent with the principal offender" or encouraged them to commit a crime. *Silva v. State,* 422 Md. at 28.

Perhaps Hersl conducted an unlawful stop-and-frisk without reasonable suspicion or probable cause. As a matter of circumstantial evidence, perhaps jurors could have speculated that Hersl stole money that was improperly taken from Tate. But the fruits of such speculation would only add up to larceny. There was no proof beyond a reasonable doubt that Hersl robbed or aided and abetted the robbery of Griffin.

40

### 4. The Government Failed to Prove Hersl Committed Robbery in Racketeering Act 5 (Santiful)

The evidence related to Antonio Santiful was likewise insufficient to prove Hersl guilty of robbery. Santiful did not identify which officer handcuffed him. Sgt. Burns conducted the initial search and was listed as the arresting officer on the evidence control sheet that showed the submission of $218. Santiful claimed that Hersl took $700 from his pocket at the police station.

As noted, Maryland law defines robbery as the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear – larceny accomplished by assault or battery. Even reading Santiful's testimony in the light most favorable to the government, Hersl may have committed larceny when he took money from Santiful's pocket at the police station, but he did not commit an assault or a battery – and consequently did not commit a robbery.

Rather, Hersl's conduct was akin to the purse snatching that was deemed not to qualify as robbery in *West v. State,* 312 Md. 197 (1988). In *West,* the victim was leaving a drug store when "a man just snatched [the victim's] purse from [her] hand and ... ran." *Id*. at 199. She did not notice that the purse was gone until after the snatcher began to run. *Id*. The Maryland Court of Appeals found the evidence insufficient to prove that the purse was taken with violence, or that the victim was put in fear, holding that "the mere snatching or sudden taking away of the property

41

from the person of another does not constitute sufficient force, violence, or putting in fear to support a robbery conviction." *Id.* at 206. *Accord Cooper v. State*, 9 Md. App. 478, 480 (1970) ("it is not robbery to obtain property from the person of another by a mere trick and without force, or to pick another's pocket without using more force than is necessary to lift the property from the pocket; nor is it robbery to suddenly snatch property from another when there is no resistance and no more force, therefore, than is necessary to the mere act of snatching.").

Here, Santiful offered no testimony about being exposed to any form of force or violence or being put in fear during his encounter with Hersl at the police station. No evidence demonstrated that Hersl possessed the criminal intent sufficient to prove robbery. The government failed to prove Racketeering Act 5.

>       **5.    The Government Failed to Prove Hersl Committed or Conspired to Commit Robbery in Racketeering Act 10 (Hamiltons)**

The incident related to Ronald Hamilton and his wife on July 8, 2016 presents different issues. Jenkins, Rayam, and Gondo clearly conspired to commit and committed robbery. But Hersl was not part of either crime. Rayam, not Hersl, stopped the Hamiltons' vehicle. Jenkins, not Hersl, interrogated Ronald Hamilton and fraudulently claimed to be a federal agent. Jenkins, not Hersl, asked Hamilton if he had any money at his house. Rayam and Jenkins, not Hersl, initially entered the Hamiltons' house. When Hersl did enter, he merely sat in a chair and watched

the Hamiltons, consistent with proper police protocol. Although Hersl later was present in the Hamiltons' bedroom, he did not do anything there: Gondo counted $20,000, Jenkins instructed Rayam to take the money, and Rayam took the money to a police car. Rayam testified that Gondo and Hersl didn't say anything more than "Okay, whatever." After the state police did the second search, Jenkins, not Hersl, asked whether Hamilton knew of other "bigwigs" that could be robbed. When other officers divided the stolen money, Jenkins was supposedly given Hersl's "portion," but no witness testified that Jenkins ever paid Hersl.

Under Maryland law, Hersl cannot be guilty of robbery or conspiracy to commit robbery merely because he was present at the police station and at the Hamiltons' house. No witness testified that he did *anything* at the police station. No witness testified that he did anything at the house that either constituted or aided and abetted robbery. His mere presence at the place where others committed a crime does not establish his participation. *Warfield v. State,* 315 Md. at 491. In short, there was no evidence that Hersl participated in a robbery or robbery conspiracy knowingly, voluntarily, and with common criminal intent with Gondo, Rayam and Jenkins, or that he encouraged them to commit the crime. *Silva v. State,* 422 Md. at 28. The mere fact that a person witnesses a crime and makes no objection to its commission does not make him a participant. *Id.* For these reasons, the government failed to prove Racketeering Act 10 against Hersl.

43

### B. The Evidence Was Insufficient to Prove That Taylor Committed Wire Fraud or Committed or Conspired to Commit Robberies

The jury convicted Taylor on Count Two based on its finding that he engaged in three substantive acts or robbery and/or robbery conspiracy (Racketeering Acts 2, 8, and 12) and three acts of wire fraud (Racketeering Acts 17, 20, 22). The jury found that the government had not proved Racketeering Act 6 (Raytawn Benjamin).

#### 1. The Government Failed to Prove Taylor Committed Wire Fraud in Racketeering Acts 17, 20, 22

For the reasons set forth in Section I, this Court must set aside the jury's finding that Taylor committed four acts of wire fraud.

#### 2. The Government Failed to Prove Taylor Conspired to Commit Robbery in Racketeering Act 2 (Whiting)

Taylor was one of six police detectives who searched Shawn Whiting's house pursuant to a search warrant. Ward obtained the warrant. Ward was in charge of the search. When Taylor found money, he alerted the entire group and the money was seized. Ward took possession of the money and testified that after he did so, Taylor asked him to "look out for him." The money that Ward had taken possession of was taken to the Western District police station. Ward left Taylor and another officer in a room with the money. He claimed that when he returned, the pile of money looked smaller, he took $3,000, and gave Taylor $1,500.

No robbery of Whiting occurred or could have occurred. The money that Ward claimed that he took from Whiting's house was taken during the course of a lawful search pursuant to a warrant. The government failed to prove the requisites for robbery under Maryland law, as more fully stated in Section II-A-2. There is no testimony that Whiting was put in fear or that a battery was committed upon him in the course of the taking of the money found in his house.

### 3. The Government Failed to Prove Taylor Committed or Conspired to Commit Robbery in Racketeering Act 8 (Stevenson)

Oreese Stevenson was sitting in a minivan parked on a city street when Jenkins blocked his vehicle. Ward searched the vehicle and found cocaine. Jenkins took Stevenson's keys from him, which ultimately gave Jenkins, Ward, Hendrix and Ward access to Stevenson's residence. When the group opened the safe, after obtaining a warrant subsequent to a "sneak-and-peek" obtained by use of Stevenson's keys, the group, including Taylor, was able to open a safe that they had found in the house. Jenkins took the money from the safe, put $100,000 back and took the rest. Ward testified that several hours later Jenkins gave Taylor, and others, $20,000, keeping the remainder for himself.

The testimony in the record regarding Taylor's presence during the Stevenson incident is similar to Hersl's presence with respect to the incident involving the Hamiltons (with the qualification that there was no testimony Hersl

ever received any money taken from the Hamiltons). For the reasons stated in Section II-A-5, the government also failed to prove Racketeering Act 8 against Taylor.

### 4.     The Government Failed to Prove Taylor Conspired to Commit Robbery in Racketeering Act 12 (Summerville)

The government failed to prove that Taylor conspired to commit robbery with respect to Summerville. Its failure of proof is similar to the Stevenson-related testimony, except that the testimony regarding Taylor's involvement with respect to Summerville is even more attenuated. Gondo, not Taylor, stopped Stevenson's vehicle. No witness testified that Taylor took the key to Summerville's storage locker or participated in obtaining the location of the storage locker from the facility's attendant. Rayam's testimony makes clear that when Rayam and Taylor entered Summerville's storage locker, Taylor merely was a passive observer. Rayam took the sock that allegedly contained Summerville's money and it was Rayam who returned the sock to Summerville. Such testimony fails to establish that Taylor knowingly and intentionally conspired to rob Summerville. For the reasons stated in Section II-A-5, the government failed to prove Racketeering Act 12 against Taylor.

* * *

46

For these reasons, the government failed to prove beyond a reasonable doubt that either defendant committed two racketeering acts. Count Two should be reversed.

### III. COUNTS THREE AND FIVE SHOULD BE REVERSED BECAUSE THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT A ROBBERY WAS COMMITTED AND, WITH REGARD TO COUNT FIVE, FAILED TO PROVE THAT THE ALLEGED ROBBERY AFFECTED INTERSTATE COMMERCE

With regard to the Hobbs Act robberies charged against Taylor (Count Three) and Hersl (Count Five), the government was required to prove three elements: (1) that the defendant coerced the victim to part with property; (2) that the coercion occurred through the wrongful use of actual or threatened force, violence or fear or under color of official right; and (3) that the coercion occurred in such a way as to affect adversely interstate commerce. *United States v. Reed,* 780 F.3d 260, 271 (4th Cir. 2015). The district court correctly instructed the jury on these elements. JA 1550-57.

### A.    Neither Defendant Committed a Robbery

For the reasons set forth in Sections II-A-5 and II-B-3, Hersl did not commit robbery against the Hamiltons and Taylor did not commit robbery against Stevenson.

47

## B. The Alleged Robbery of the Hamiltons Did Not Affect Interstate Commerce [Hersl Only]

To satisfy the interstate commerce component of a Hobbs Act robbery charge, this Court requires that the government prove at least a "minimal" effect on interstate commerce. *United States v. Taylor,* 754 F.3d 217, 222 (4th Cir. 2014); *United States v. Spagnolo,* 546 F.2d 1117, 1119 (4th Cir. 1976). In *Taylor,* the Court affirmed a Hobbs Act robbery conviction where the defendant robbed a marijuana dealer. 754 F.3d at 224-26. Simply depleting the assets of a business engaged in interstate commerce can satisfy the interstate commerce nexus of the Hobbs Act. *United States v. Bengali,* 11 F.3d 1207, 1212 (4th Cir.1993).

The analysis changes considerably when, as here, an individual is robbed in his own home. In *Taylor*, this Court went to considerable lengths "not to imply that the reach of the Hobbs Act is without limits. All robberies are disruptive, but not every disruption is an obstruction of commerce." 754 F.3d at 226. The Court cited a Sixth Circuit case in which "the jurisdictional element of the Hobbs Act was not satisfied when the defendant stood convicted of robbing 'private citizens in a private residence' of money, some of which just happened to 'belong[] to a restaurant doing business in interstate commerce." *Id.* (quoting *United States v. Wang,* 222 F.3d 234, 240 (6th Cir. 2000)). *See also United States v. Perrotta,* 313 F.3d 33, 36 (2d Cir. 2002) ("[T]he government must show something more than the victim's employment at a company engaged in interstate commerce to support

48

Hobbs Act jurisdiction."); *United States v. Collins,* 40 F.3d 95, 100 (5th Cir. 1994) (overturning Hobbs Act conviction where the robbery victim "was an individual whose only connection with interstate commerce was his employment by a business engaged in interstate commerce"); *United States v. Quigley,* 53 F.3d 909, 910-11 (8th Cir. 1995) (overturning Hobbs Act conviction where defendants robbed individuals who were on their way to a liquor store to purchase beer that had traveled in interstate commerce).

This case presents the precise situation envisioned by the Court in *Taylor.* Ronald Hamilton testified that he sold used cars, operated an assisted living business in Baltimore, owned rental properties, and gambled frequently. He did not have any drugs in his home or car.

On July 8, 2016, Hamilton and his wife were living in a recently-purchased house in Maryland and visited a Home Depot store in Maryland to shop for items for the house. First, Rayam stole approximately $3,400 from Ronald Hamilton's shirt in a shopping center parking lot, then multiple officers (not including Hersl) stole $25,000 from the Hamiltons' bedroom. That is, officers stole $3,400 from a private individual in a private car shopping for construction products for his private house, and $25,000 in personal savings kept in that private house. While unlawful, this conduct was not a Hobbs Act robbery, because it did not obstruct interstate commerce.

49

Merely because Hamilton's business had some modest interstate component (such as buying cars at an auction in Pennsylvania) did not turn a private theft into a federal crime. As in *Taylor,* the fact that Hamilton's funds happened to belong to a sole proprietor doing business in a manner that touched interstate commerce is not sufficient to violate the Hobbs Act. Likewise, the fact that Hamilton may have intended to purchase goods that had moved in interstate commerce did not create federal jurisdiction, any more than the victims' intent to buy beer in the Eighth Circuit's *Quigley* case. Even viewing Hersl's limited role in the events related to Ronald Hamilton and his wife in the light most favorable to the government, what took place was a state crime, not a federal crime. For this reason as well as the failure of the government to prove robbery, Count Five should be reversed.

## IV.   THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING DEFENDANTS' MOTION IN LIMINE AND SUBSEQUENT OBJECTIONS TO LIMIT THE GOVERNMENT'S USE OF THE LEGAL TERM "ROBBERY"

As the preceding sections make clear, a central issue in the case against Hersl and Taylor was whether their encounters with alleged victims of racketeering acts constituted robberies rather than offenses such as theft or receiving stolen property that are not RICO predicates. In denying Hersl's motion in limine to preclude the government from referring to acts committed by its cooperating witnesses as robberies, the district court declined to "impose a blanket prohibition

on referring to these things as robberies," JA 160, but directed "the Government to be restrained and not use that word unnecessarily…" *Id*.

The government paid no heed to this admonition. It elicited testimony from cooperating codefendant police officers that utilized the term "rob," beginning with the first witness, Ward, who testified that both individually and with his police colleagues, he robbed people. JA 171-73. Ward identified Taylor and Hersl as fellow officers with whom he "robbed civilians," JA 172-73, although he failed to identify any specific robbery that he supposedly committed with Hersl. Hendrix testified that he would "rob people" with Ward, Jenkins and Taylor. JA 449. Rayam testified that he robbed people with Hersl, Taylor, and others. JA 562.

Responding to Hersl's objection during Rayam's testimony, the district court "agree[d] with not overusing" the term robbery and directed the government to "rephrase it so that you don't use the word 'robbery' unless it's necessary." JA 563. But by then the horse was miles beyond the barn door. During the testimony of the final cooperating codefendant, Gondo, the government once again asked, "when did you rob people?" "When did you rob citizens?" and "When did you start robbing people?" One colloquy is illustrative:

> **Q.**   And when you joined the Gun Trace Task Force, did you rob people?
> **A.**   Yes.
> **Q.**   And who did you rob people with on the Gun Trace Task Force?
> **A.**   People on my squad.

51

| | |
|---|---|
| **Q.** | And who are they? |
| **A.** | Sergeant Allers – Former Sergeant Allers, Jemell Rayam, Maurice Ward, Hendrix, Wayne Jenkins, Taylor, and now Hersl. |
| **Q.** | Were you armed when you robbed people when you were a member of the Gun Trace Task Force? |
| **A.** | Yes; with my duty weapon. |
| **Q.** | And were other officers on the Gun Trace Task Force armed when you robbed people with them? |
| **A.** | Yes. |
| **Q.** | Including Defendants Hersl and Taylor? |
| **A.** | Yes. |
| **Q.** | Did you physically restrain people with handcuffs when they were being robbed? |
| **A.** | Yes. |
| **Q.** | Did other members of the Gun Trace Task Force do that? |
| **A.** | Yes. |
| **Q.** | Including Defendants Hersl and Taylor? |
| **A.** | That's correct. |

JA 1148-49.

Viewed in the aggregate, the testimony of multiple former Maryland police officers that, as a matter of Maryland law, they, Hersl and Taylor committed robbery was vastly more prejudicial than probative and should have been excluded under Fed. R. Evid. 403.

Moreover, the former officers' characterization of certain acts as robberies constitutes lay witness testimony in the form of an opinion or inference. Fed. R. Evid. 701 authorizes admission of lay opinion testimony only if it is (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue. Reading Rule 701 together

with Rule 704, which provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," this Court has held that "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver,* 470 F.3d 550, 561-62 (4th Cir. 2006) (citation omitted). Testimony laden with legal "terms of art" is likewise generally prohibited, viewed as (1) not helpful to the jury, in that it simply tells the jury what result to reach, (2) potentially confusing or misleading the jury, and (3) potentially usurping the function of the trial court in stating the applicable law. *United States v. Wright,* 1987 WL 30617 at *2 (4th Cir. 1987) (unpublished).

In *United States v. Perkins,* 470 F.3d 150 (4th Cir. 2006), this Court stated that "Rule 701 forbids the admission of expert testimony dressed in lay witness clothing, but it 'does not interdict all inference drawing by lay witnesses.'" (citation omitted). *Id.* at 156 (internal citation omitted). The testimony from Ward, Hendrix, Rayam and Gondo was, at least in substantial part, quintessential impermissible expert testimony dressed in lay witness clothing, particularly given that they were former police officers testifying about matters of criminal law. Indeed, the former officers' legal interpretation of their – and Hersl and Taylor's – prior acts as robbery was little different than drug agents' lay opinion

interpretations of wiretap recordings – testimony that this Court held to be reversible error in *United States v. Johnson,* 617 F.3d 286 (4th Cir. 2010). In *Johnson,* testimony by a Drug Enforcement Administration ("DEA") agent whose lay opinion testimony interpreting recordings for which he was not present was held to be reversible error. Discussing Rule 701's mandate that testimony be based on personal knowledge, the court differentiated between permissible opinions based on contemporaneous perceptions and impermissible opinions by law enforcement officers who were not present to observe events. *Id.* at 293 (citing *Perkins*, 470 F.3d at 156). Here, while the former officers might permissibly have used the term "rob" to describe their own conduct, their persistent and sweeping use of the term to describe others' actions was effectively an opinion about specific actions by Hersl and Taylor, including actions charged in the indictment that the witnesses did not even claim to observe.

Permitting this testimony was an abuse of discretion. Moreover, given the importance of the robbery issue, the error could not be, and was not, harmless. Because it does not "appear[] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Mitchell v. Esparza,* 540 U.S. 12, 17-18 (2003) (citation and quotation marks omitted), the convictions must be reversed.

**V.     THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING DEFENDANTS' MOTION FOR MISTRIAL FOLLOWING A LENGTHY, HIGHLY PREJUDICIAL OUTBURST BY GOVERNMENT WITNESS RONALD HAMILTON**

During cross-examination by Taylor's counsel, Ronald Hamilton was asked

about mortgage payments on the house in Carroll County. The questioning caused

Hamilton to launch into a lengthy diatribe:

Q.     What are your mortgage payments?

A.     Does that make a difference? What's – this right here destroyed my whole fuckin' family.

        Sorry. Sorry, Your Honor.

THE COURT:       It's all right.

THE WITNESS:    This destroyed my whole family. I am in a divorce process right now because of this bullshit. This destroyed my whole fuckin' family, man.

        You sit here asking me a question about a fuckin' house. My wife stays in the fuckin' Walmart every fuckin' night until I come home.

        If you want to know that, worry about that. That's what the fuck's the matter in here, man. Everybody's life is destroyed, man.

        My house don't have nothing to do with this. The problem is my wife is taking medication 'cause of this.

THE COURT:       Sir, sir –

THE WITNESS:    Man – I'm sorry, Your Honor. I'm sorry to the courts. But the fact of the matter is, man, my house don't have nothing to do with this.

The fact of the matter is, came in my house, destroyed my family. I'm in a divorce process because of this. Because of this.

This has put so much financial pressure on my family. Kids, man, are scared to go in the house because of this.

\* \* \*

JA 1028-29.

After Mr. Hamilton completed his testimony, the court recessed for the day. The following morning, Hersl moved for a mistrial based on Hamilton's outbursts. In support of the motion, Hersl observed that even though the outburst took place during cross-examination by Taylor's counsel, they were effectively directed at Hersl and that "things which would normally not be admissible he did in a very emotional and emphatic way…." JA 1036-37. Taylor joined the motion and the government opposed it. JA 1037-40. Taylor argued that Hamilton's outburst was "a bell that we did not invite to be r[u]ng and cannot be unrung." JA 1040.

The district court denied the request for a mistrial. JA 1041. Over the government's objection, it agreed to strike that portion of Hamilton's testimony. JA 1043. When the jury returned, the Court instructed the jury as follows:

Before we get started today, I do want to think back to yesterday afternoon. You will recall that the witness at the end of the day, Mr. Hamilton, when he was testifying, that there was what I will just describe as an outburst towards the conclusion of his testimony.

That – what he said at that point, it was not responsive to any specific question that had been asked and it is not evidence.

56

I am instructing you that it is stricken from the testimony, and you may not consider it in any way as part of the evidence in this case. It is simply not evidence.

Thank you.

JA 1049.

This remedial action was insufficient to cure the prejudicial effects of Hamilton's outburst. Hamilton emotionally told the jury that Hersl and his fellow officers destroyed his family, caused divorce proceedings, and traumatized his wife and children. When trial testimony overflows the boundaries established by the Federal Rules of Evidence, the district court utilizes its discretion in determining whether to grant a mistrial, *United States v. Johnson,* 587 F.3d 625, 631 (4th Cir. 2009). Ordinarily, a less drastic alternative – usually a curative, cautionary, or limiting instruction – suffices to prevent prejudice to the defendant, *United States v. Martin,* 756 F.2d 323, 328 (4th Cir. 1985), particularly if the danger of prejudice is slight in view of the overwhelming evidence of guilt." *United States v. Ham,* 998 F.2d 1247, 1254 (4th Cir.1993) (internal citation omitted).

But that default position only makes sense when the stricken statement was brief and easily scrubbed from the jury's collective memory, as in cases such as *United States v. Morrow,* 731 F.2d 233, 235 n.4 (4th Cir.1984) (affirming denial of mistrial when effect of improperly volunteered testimony that defendant "had gotten out of prison" shortly before robbery was "tenuous at best" and "a mere

57

superfluity"). Ronald Hamilton's volunteered, compelling, and highly emotional outburst in this case was vastly more impactful and could not have been more different. It lingered in the jurors' minds overnight before the district court delivered its brief limiting instruction. Under these circumstances, the court's attempted curative measure was "very close to an instruction to unring a bell," *United States v. Murray,* 784 F.2d 188, 189 (6th Cir. 1986) – or, as Judge Learned Hand observed, "a recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." *Nash v. United States,* 54 F.2d 1006, 1007 (2d Cir. 1932).

A courtroom episode is inherently prejudicial if "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook v. Flynn,* 475 U.S. 560, 570 (1986) (quoting *Estelle v. Williams,* 425 U.S. 501, 505 (1976)). "Certain courtroom situations are so beyond the pale, so prejudicial, that no amount of *voir dire* and cautionary instructions can remedy the defect." *United States v. Mannie,* 509 F.3d 851, 856 (7th Cir. 2007). Hamilton's outburst was remarkable similar to outbursts, blurts, and prejudicial comments in cases where the district court committed reversible error by giving a curative instruction rather than granting a mistrial. In *Murray*, for example, the Sixth Circuit held that a curative instruction could not remedy an experienced FBI agent's deliberate statement that he had asked the defendant to take a polygraph test. 784 F.3d at 189. In *United States v.*

*Street,* 548 F.3d 618, 627 (8th Cir. 2008), the Eighth Circuit reversed a conviction in a murder case where the government's jailhouse informant witness unexpectedly testified that the defendant had taken and failed a polygraph test.

In *United States v. Schiff,* 612 F.2d 73 (2d Cir. 1979), the Second Circuit reversed a conviction where the district court had erroneously admitted a recording of the defendant's talk show appearance conducted long after the events in question, holding that "to regard 'cautionary instructions as talismans for the solution of any possible prejudice problem' is tantamount to 'effecting a repeal of the prejudice rule, which by its terms concedes the possibility that the negative aspects of some evidence may simply be unmanageable for the factfinder regardless of instructions.'" *Id.* at 82 (citation omitted). The same court, in *United States v. Jones,* 16 F.3d 487 (2d Cir. 1994), held that a limiting instruction was insufficient to undo the prejudice caused by erroneous admission of testimony about the defendant's prior criminal record. *Id.* at 493. So did the Tenth Circuit in *United States v. Sands,* 899 F.2d 912 (10th Cir. 1990). As the California Supreme Court has observed in the context of mistrial motions: "Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice." *People v. Wharton,* 53 Cal.3d 522, 565 (1991).

This case is on all fours with such cases. Ronald Hamilton passionately told the jury that Hersl helped to destroy his life. The district court's mild, delayed instruction to the jury that the testimony was stricken was too little, too late to remedy the damage done. By the time the district court spoke, the bell had been ringing in the jurors' heads all night.

## VI. THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING TAYLOR'S MOTION TO DISMISS OR FOR A CONTINUANCE BECAUSE OF PREJUDICAL PRETRIAL PUBLICITY [TAYLOR ONLY]

On January 17, 2018 – five days prior to the start of trial—Taylor moved to dismiss the superseding indictment, or in the alternative for a three-month continuance, because of prejudicial pretrial publicity. JA 165A-N. The motion cited several articles about the case from the *Baltimore Sun*, intense television, radio, and newspaper coverage in Baltimore, and multiple press releases by the United States Attorney's Office related to guilty pleas by codefendants and defendants in related cases. The motion further recited that "[b]y Googling just the police unit name, counsel found over 13,400 non-duplicative news reports about the case online." JA 165A-C. Taylor also noted additional publicity relating to Freddie Gray (a Baltimore resident whose death in police custody led to protests and the prosecution of BPD officers) and a consent decree that BPD entered into with the Department of Justice.

The government opposed the motion and the district court proceeded with jury selection on January 22, 2018. Potential jurors substantiated that pretrial publicity was negative, had lasted for many months, and was immensely prejudicial. One remarked that the case has been on the news for the last six months "constantly." JA 1974 (sealed). Another confirmed that the *Baltimore Sun* covered this case relentlessly. JA 1975 (sealed). And a third noted radio, newspaper, and television coverage and stated that "the press has been very, very negative." JA 1980 (sealed). Other potential jurors noted the death on November 15, 2017 of Baltimore homicide detective Sean Suiter, who was scheduled to testify before a federal grand jury in this case against GTTF officers the following day. JA 1981-85. Potential jurors could well have speculated that defendants who were members of the GTTF could possibly be guilty of murder.

The district court abused its discretion by refusing, at a minimum, to grant a brief continuance while the intense publicity abated. The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment guarantee a criminal defendant's right to a fair trial. Negative publicity during trial or negative pretrial publicity infecting the community from which the jury pool is drawn can make a fair trial difficult if not impossible. *Irvin v. Dowd*, 366 U.S. 717 (1961); *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

In *Skilling v. United States*, 561 U.S. 388 (2010), the Supreme Court refined the factors that involve prejudicial pretrial publicity (for those cases where there is not presumed prejudice). Those factors include the size and diversity of the jury pool, the style and tone of pretrial publicity, and the length of time between the offense and the trial. 561 U.S. at 381-85. The *Skilling* Court also reaffirmed that "[n]o hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." *Id.* at 386.

Here, the *Skilling* factors were met:

--*the size and diversity of the jury pool*: the *Skilling* court noted that Houston is the nation's fourth most populous city, with more than 4.5 million people. Baltimore City is 30th with 617,000 people and the Baltimore metropolitan area is 20th with just under three million, making the impact of pretrial publicity much greater;

--*the style and tone of pretrial publicity*: the pretrial publicity was overwhelmingly negative and its tone was almost without exception accusatory and adverse. *See* JA 165D-N (attachments to motion to dismiss including *Baltimore Sun* article published less than three weeks before start of trial); and

--*the length of time between the offense and the trial*: the indictments and the trial were less than a year from each other.

In *United States v. Gray*, 788 F.2d 1031(4th Cir. 1985), the trial court was admonished for not conducting adequate measures to ensure a fair trial after the jury in that case might have been exposed to a single newspaper article about the defendant. A general instruction or admonition not to read or listen to reports about the case was insufficient to "obliterate the prejudice." In this case, simply striking for cause some of the potential jurors could not obliterate the massive prejudice. The district court abused its discretion by failing to grant a delay in the trial.

## VII. THE DISTRICT COURT ERRED BY DENYING A MOTION FOR NEW TRIAL REGARDING *BRADY* ISSUES CONCERNING GOVERNMENT WITNESS ANTONIO SANTIFUL

As noted above, after the jury verdict a federal grand jury in Maryland indicted government witness Antonio Santiful and others for conspiring to distribute cocaine base. Even though the indictment alleged that Santiful participated in a conspiracy that began in 2017, two months prior to his testimony in this case, prior to and during trial the government did not disclose its ongoing investigation into Santiful's illegal activity. After learning of the Santiful indictment from the media, both defendants moved for a new trial based on a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *See* JA 1776-79, 1783-85, 1788-93.

Utilizing the standard set forth in *United States v. Wolf,* 860 F.3d 175 (4th Cir. 2017), the district court denied the motions. *Wolf* reiterated the longstanding

five-part test for a new trial: (a) the evidence must be, in fact, newly discovered, *i.e.*, discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied upon must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal. *Id.* at 189 (citation omitted). More specifically, *Wolf* held that

> To succeed on a *Brady* violation, the proponent must "show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them.

*Id.* at 189-90 (citation omitted).

In denying the motions, the district court noted that during Santiful's testimony, the government impeached him with two prior convictions, one involving drugs, and that new narcotics charges against Santiful were not material because they amounted to

> minimally additional impeachment, cumulative information that I do not think demonstrates a reasonable probability to undermine confidence in the outcome of the jury's consideration of this case.
>
> And the third factor as well is did the prosecution have the materials and fail to disclose them. Again, only in some very large sense does it appear that a Government agency had some of this information. The prosecutors did not. And so, overall, I don't find that there's any basis to grant a new trial.

64

JA 1796-99. The court made similar findings in denying Hersl's motion. JA 1875-78.

The district court erred on both the failure to disclose issue and the materiality issue. Under *Kyles v. Whitley*, 514 U.S. 419 (1995), "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437. In *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010), this Court cited *Kyles* and held that "*Brady*'s commands do not stop at the prosecutor's door; the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness." *Id.* at 951.

But in *Robinson,* this Court further stated: "We draw no hard and fast lines here about the scope of *Brady* imputation, and we reiterate that prosecutors have a duty to learn of exculpatory evidence gathered by those acting on the government's behalf." *Id.* at 952. Accepting at face value the assertion that the two Assistant United States Attorneys who prosecuted Hersl and Taylor did not know about the Santiful investigation, the district court nevertheless should have imputed to them knowledge of an investigation of one of their witnesses being conducted by the same division (Northern Division) of the same U.S. Attorney's Office (Maryland) operating out of the same office (Baltimore) and involving the same geographic territory (Baltimore City). Knowledge of one member of the prosecutor's office

will be imputed to the whole office. *See Giglio v. United States,* 405 U.S. 150, 154 (1972) ("A prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for [*Brady*] purposes to the Government.") (citing Restatement (Second) of Agency (1958)). "An Assistant United States Attorney using a witness with an impeachable past has a constitutionally derived duty to search for and produce impeachment information requested regarding the witness…. Trial counsel for 'the government' will not have discharged that duty unless all those in the government in a position to know of such information have been canvassed." *United States v. Osorio*, 929 F.2d 753, 761–62 (1st Cir. 1991); *United States v. Perdomo*, 929 F.3d 967, 970 (3d Cir. 1991) ("The [federal] prosecutor was obliged to produce information regarding [witness]'s background because such information was available to him.") (citing *United States v. Auten,* 632 F.2d 478, 481 (5th Cir. 1980)). Even after *Kyles,* the D.C. Circuit held that within the United States Attorney's Office for the District of Columbia – which is much larger than the District of Maryland office and prosecutes cases in both the federal district court and D.C. Superior Court – "the prosecutor is responsible (at a minimum) for all Brady information in the possession of that office." *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 896 (D.C. Cir. 1999).

Moreover, the undisclosed information about Santiful was clearly material. Under *Kyles,* "the touchstone of materiality [in the *Brady* context] is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434 (internal quotation marks omitted)). That is, the record must demonstrate that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," that is, the evidence must be "likely to have changed the verdict." *Moseley v. Branker*, 550 F.3d 312, 318 (4th Cir. 2008) (internal quotation marks omitted)." Here, evidence that Santiful was a current, not merely a former, drug dealer would have been extremely significant to cross-examining him. *See Davis v. Alaska*, 415 U.S. 308, 316-17 (1974) (exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination). Moreover, defense counsel could have framed effective arguments questioning why the government was granting immunity to someone who was still engaged in illegal activity even at the time he came to court to testify. Such evidence could have seriously undermined the prosecutors' credibility and produced a different trial result.

Applying the *de novo* standard of review that applies as to *Brady* violations, this Court should find a violation and reverse the district court's denial of a new trial.

## VIII.  THE DISTRICT COURT IMPOSED UNREASONABLE SENTENCES ON BOTH DEFENDANTS

### A.    Hersl

The district court's sentence was substantively unreasonable because the court failed to adequately consider Hersl's vulnerability as an incarcerated police officer, his acceptance of responsibility, and his prior contributions to the community and family circumstances. In determining substantive reasonableness, a within-Guidelines range sentence is "presumptively reasonable," *United States v. White*, 850 F.3d 667, 674 (4th Cir.), *cert. denied*, 137 S.Ct. 2252 (2017), but "a district court's choice of sentence is not without limit." *United States v. Howard,* 773 F.3d 519, 535 (4th Cir. 2014). "Inherent in the concept of reasonableness is the notion that the rare sentence may be unreasonable, and inherent in the idea of discretion is the notion that it may, on infrequent occasion, be abused." *United States v. Engle,* 592 F.3d 495, 504 (4th Cir.2010) (internal citation and quotation marks omitted).

The district court calculated the advisory sentencing guidelines range at offense level 37, criminal history category I, for a range of 210 to 262 months.

Even though its sentence of 216 months fell within that range, the sentence was unreasonable.

First, while the district court noted that a prison term "may be of particular difficulty for a former police officer," JA 1931, it failed to adequately address the full panoply of consequences for a longtime police officer who is remanded to the custody of the Bureau of Prisons.

Because Hersl was involved in the prosecution of so many criminals who are confined in the mid-Atlantic region, he inevitably would be (and indeed has been) designated to a prison located thousands of miles from his family and friends. Geographical considerations aside, the court should have weighed much more heavily in its § 3553(a) analysis the defendant's susceptibility to prison abuse by virtue of his prior employment and the nature of his high-profile offense.

The Supreme Court has approved a downward departure because of the danger that police officers face in prison. *Koon v. United States*, 518 U.S. 81, 111-12 (1996) (concluding that the "widespread publicity and emotional outrage" that surrounded the beating of Rodney King made defendant police officers "particularly likely to be targets of abuse during their incarceration" and justified a downward departure). Many other courts have also imposed reduced sentences on this basis. In *United States v. LaVallee*, 439 F.3d 670, 677 (10th Cir. 2006), the Tenth Circuit affirmed a downward departure under § 5K2.0 based on the

defendant correctional officer's particular susceptibility to abuse in prison. *Id*. at 678. In *United States v. Volpe*, 78 F. Supp. 2d 76, 84 (E.D.N.Y. 1999), *aff'd in part, dismissed in part*, 224 F.3d 72 (2d Cir. 2000), the court reduced the sentence of a police officer convicted of criminal civil rights violations related to the brutal sexual assault of an inmate in a jail station, reasoning that the violence of Volpe's crime, his status as a police officer, and the extensive national publicity surrounding the case would "expose Volpe to abuse at the hands of other prisoners or segregation to avoid such abuse." *Id*. at 82. Most recently in this circuit, a district court granted a downward departure and reduced the sentence of a South Carolina police officer who shot a civilian without justification, in part because of the danger to the officer that flowed from extensive publicity – publicity not unlike what existed in this case. *United States v. Slager,* 2018 WL 445497 at 24 (D.S.C. Jan. 16, 2018). The district court was unreasonable in not granting the same relief to Hersl.

Second, from opening statement through sentencing, Hersl never denied his involvement in the misconduct of the gun unit. From opening statement through closing argument, that position never varied. At sentencing, counsel stated that "there's no question that Mr. Hersl is guilty of very serious crimes." JA 1608. Hersl stood trial to contest his guilt on the specific federal charges set forth in the superseding indictment, including whether as a matter of Maryland law his actions

constituted the RICO predicate of robbery or some other state offense. Under these circumstances, the district court's failure to reduce his sentence to take into account what it acknowledged as "some acceptance of responsibility by Mr. Hersl," JA 1932, effectively imposed a "trial penalty." As the Supreme Court has observed in the context of vindictive prosecutions, such a penalty is constitutionally prohibited. "For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982).

Finally, while the district court took note of the positive aspects of Hersl's service as a police officer and his commitment to his community and family, JA 1930-31, defendant respectfully suggests that the sentence failed to take into account the full extent of defendant's commitment to his ten-year-old son, and his commitment to his community, which included removing hundreds of guns from the streets of Baltimore. Hersl received a Medal of Honor from the BPD in 2011 and an award from Johns Hopkins University for his service in the Eastern District, where the Johns Hopkins School of Medicine is located. JA 2297-99 (sealed).

The district court's refusal to grant a variance solely on this basis is not independently unreasonable, but its decision figures into the aggregate of sentencing factors that collectively make a 216-month sentence unreasonable.

## B.    Taylor

Taylor's sentence was also substantively unreasonable, for many of the same reasons. As with Hersl, the court failed to adequately consider Taylor's vulnerability as an incarcerated police officer and his prior contributions to the community and family circumstances.

The district court calculated the advisory sentencing guidelines range at offense level 37, criminal history category I, for a range of 210 to 262 months. In imposing a guidelines sentence of 216 months, the court failed to adequately consider Taylor's limited role in the activities of more senior officers such as Jenkins, Rayam and Gondo. To the contrary, as former officer Donald Stepp, Jr. testified, Mr. Taylor was "one of the newbies to the unit." Tr. 2/1/18 at 47.

The court also failed to give sufficient weight to the consequences of separating Taylor from his 10-year-old son, a middle school student in Maryland. Lastly, the court failed to give sufficient weight to Taylor's medical conditions, including a back injury from an automobile accident in 2013 (for which he wore a brace prior to his incarceration), high blood pressure that requires medication, and a medical diagnosis of depression. *See* JA 2328-42 (sealed sentencing memorandum).

72

## CONCLUSION

This Court should reverse the judgments against defendants Hersl and Taylor and direct entry of judgments of acquittal or, alternatively, remand for a new trial or new sentencing hearing.

Respectfully submitted,

/s/ H. Mark Stichel
H. Mark Stichel
Astrachan Gunst Thomas, P.C.
217 East Redwood Street, 21st Floor
Baltimore, Maryland 21202
hmstichel@agtlawyers.com
410-783-3550

/s/ C. William Michaels
C. William Michaels
1579 Dellsway Road
Baltimore, Maryland 21286
cwmichaels@earthlink.net
443-846-5207
*Attorneys for*
*Marcus Roosevelt Taylor (No. 18-4414)*

Dated:  November 13, 2018

/s/ Stuart A. Berman
Stuart A. Berman

Nida Kanwal *On Brief*
Lerch, Early & Brewer, Chtd.
Bethesda, Maryland 20814
saberman@lerchearly.com
nkanwal@lerchearly.com
301-657-0729
*Attorneys for Daniel Thomas Hersl*
*(No. 18-4453)*

**CERTIFICATE OF COMPLIANCE REGARDING
FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)
AND LOCAL RULE 32(b)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief has been prepared in Microsoft Word, Times New Roman, 14 point, a proportionally spaced font and contains 16,979 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: November 13, 2018

/s/ Stuart A. Berman
Stuart A. Berman
*Counsel for Defendant Hersl*

/s/ H. Mark Stichel
H. Mark Stichel
*Counsel for Defendant Taylor*

/s/ C. William Michaels
C. William Michaels
*Counsel for Defendant Taylor*

74

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing *Opening Brief of Appellant* was filed with the United States Court of Appeals for the Fourth Circuit via hand delivery and electronically using the Court's CM/ECF filing system which will send notice of such filing to all counsel of record

Derek E. Hines
Leo J. Wise
Office of the United States Attorney
36 South Charles Street,
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800
derek.hines@usdoj.gov
Leo.Wise@usdoj.gov

Counsel for Appellee

Dated: November 13, 2018

<u>/s/ Stuart A. Berman</u>
Stuart A. Berman
*Counsel for Defendant Hersl*


<u>/s/ H. Mark Stichel</u>
H. Mark Stichel
*Counsel for Defendant Taylor*


<u>/s/ C. William Michaels</u>
C. William Michaels
*Counsel for Defendant Taylor*