RECORD NO. 18-4414(L)
CONS./W 18-4453

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiffs-Appellee,*

v.

MARCUS ROOSEVELT TAYLOR;
DANIEL THOMAS HERSL,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

**CONSOLIDATED REPLY BRIEF OF APPELLANTS**

C. William Michaels
ATTORNEY AT LAW
1579 Dellsway Road
Baltimore, Maryland 21286
(410) 321-5770
cwmichaels@earthlink.net

H. Mark Stichel
ASTRACHAN GUNST
& THOMAS PC
217 East Redwood Street
Baltimore, MD 21202
(410) 783-3547
hmstichel@agtlawyers.com

*Counsel for Appellant
Marcus Roosevelt Taylor*

Stuart A. Berman
Nida Kanwal  *On Brief*
LERCH, EARLY &
BREWER, CHARTERED
Suite 700
7600 Wisconsin Avenue
Bethesda, MD 20814
(301) 657-0729
saberman@lerchearly.com

*Counsel for Appellant
Daniel Thomas Hersl*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ...................................................................iv

SUMMARY OF ARGUMENT ............................................................1

ARGUMENT ....................................................................................4

    I.    NO RATIONAL TRIER OF FACT COULD HAVE FOUND
        BEYOND A REASONABLE DOUBT TWO RACKETEERING
        ACTS PER DEFENDANT ON COUNT ONE ...................................4

        A.    The Verdicts Cannot Be Sustained on Any Basis Other than
               the Two Racketeering Acts Specified for Each Defendant on
               That Count........................................................................5

        B.    The Specified Wire Transmissions Were Not Reasonably
               Foreseeable to Any Conspirator..................................................8

    II.    THE GOVERNMENT FAILED TO PROVE TWO
        RACKETEERING ACTS PER DEFENDANT
        ON COUNT TWO .............................................................11

        A.    Hersl Did Not Commit or Conspire to Commit Robberies ......12

               1.    For Racketeering Act 3 (Griffin), the Jury Rejected
                    the Government's Extortion Theory and the Evidence
                    Did Not Support Its Robbery Verdict............................12

               2.    For Racketeering Act 4 (Tate), Hersl Was Neither a
                    Principal Nor an Accomplice to a Robbery...................15

                3.    For Racketeering Act 5 (Santiful), the Government
                    Failed to Prove Hersl Committed a Robbery ...............16

                4.    For Racketeering Act 10 (Hamiltons), Hersl Did Not
                    Commit or Conspire to Commit Robbery ....................18

i

      B.    Taylor Did Not Commit or Conspire to Commit Robberies ...21

          1.    For Racketeering Act 2 (Whiting), Taylor Did Not Conspire to Commit Robbery,........................................21

          2.    For Racketeering Act 8 (Stevenson), Taylor Did Not Conspire to Commit Robbery........................................22

          3.    For Racketeering Act 12 (Summerville), Taylor Did Not Conspire to Commit Robbery.................................24

III.    THE GOVERNMENT FAILED TO PROVE THE HOBBS ACT ROBBERIES IN COUNTS THREE AND FIVE AS TO HERSL AND TAYLOR, RESPECTIVELY, AND FAILED TO PROVE THAT THE COUNT FIVE ROBBERY AFFECTED INTERSTATE COMMERCE ...........................................24

IV.    THE DISTRICT COURT IMPERMISSIBLY PERMITTED EXCESSIVE USE OF THE LEGAL TERM "ROBBERY" .............27

V.    THE DISTRICT COURT'S FAILURE TO DECLARE A MISTRIAL AFTER RONALD HAMILTON'S OUTBURST WAS REVERSIBLE ERROR ...........................................29

VI.    THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED TAYLOR'S MOTION TO DISMISS OR POSTPONE BECAUSE OF PRETRIAL PUBLICITY [TAYLOR ONLY] ...............................................................30

VII.    THE TRIAL COURT ERRED BY FAILING TO GRANT A NEW TRIAL FOLLOWING DEFENDANTS' DISCOVERY OF THE CHARGES AGAINST WITNESS ANTONIO SANTIFUL.....31

VIII.    THE SENTENCES WERE UNREASONABLE................................33

      A.    Hersl .............................................................................33

      B.    Taylor ...........................................................................34

CONCLUSION ..................................................................................35

REQUEST FOR ORAL ARGUMENT ....................................................35

CERTIFICATE OF COMPLIANCE......................................................... 36

CERTIFICATE OF SERVICE ...............................................................37

## TABLE OF AUTHORITIES

Page(s)

## CASES

*Andres v. United States*, 333 U.S. 740 (1948) .................................................... 6

*Coles v. State*, 374 Md. 114 (2003) ................................................................ 17-18

*Cooper v. State*, 9 Md. App. 478 (1970)............................................................. 17

*Davis v. United States*, 160 U.S. 469 (1895) ........................................................27

*Dunn v. United States*, 284 U.S. 390 (1932) ...................................................... 7

*Johnson v. Louisiana*, 406 U.S. 356 (1972) ...................................................... 6

*Kann v. United States*, 323 U.S. 88 (1944)......................................................... 8

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................... 31-32

*Lee v. State*, 59 Md. App. 28 (1984)...................................................................... 15

*Leeson v. State,* 293 Md. 425 (1982) ................................................................... 15

*Moore v. United States,* 271 F.2d 564 (4th Cir. 1959) ......................................... 11

*Nye & Nissen v. United States*, 336 U.S. 613 (1949) ........................................... 16

*Ocasio v. United States*, 136 S. Ct. 1423 (2016) ................................................. 14

*Pereira v. United States*, 347 U.S. 1 (1954) ....................................................... 8

*Salinas v. United States*, 522 U.S. 52 (1997) ..................................................... 5

*Santoni v. State*, 5 Md. App. 609 (1969) ............................................................. 15

*Schmuck v. United States*, 489 U.S. 705 (1989) .................................................. 8

*Skilling v. United States*, 561 U.S. 358 (2010) ...................................................... 30

*Sullivan v. Louisiana*, 508 U.S. 275 (1993)............................................................ 11

*Taylor v. United States*, 136 S.Ct. 2074 (2016)......................................................25

*United States v. Bentz,* 21 F.3d 37 (3d Cir. 1994) ...................................................10

*United States v. Burfoot*, 899 F.3d 326 (4th Cir. 2018)..................................... 9-10

*United States v. Cianci*, 378 F.3d 71 (1st Cir. 2004) ............................................. 6

*United States v. Computer Sciences Corp.*, 689 F.2d 1181 (4th Cir. 1982) .......... 8

*United States v. Edwards*, 303 F.3d 606 (5th Cir. 2002) ................................... 6-7

*United States v. Edwards,* 188 F.3d 230 (4th Cir. 1999) .................................... 8

*United States v. Ham*, 58 F.3d 78 (4th Cir. 1995) ............................................... 7

*United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014) ....................................... 7

*United States v. Labat*, 905 F.2d 18 (2d Cir. 1990) ........................................... 16

*United States v. Luciano-Mosquera*, 63 F.3d 1142 (1st Cir. 1995) ................... 16

*United States v. Mata*, 491 F.3d 237 (5th Cir. 2007) ......................................... 16

*United States v. McIver*, 470 F.3d 550 (4th Cir. 2006) ........................................28

*United States v. Merlino*, 310 F.3d 137 (3d Cir. 2002) ....................................... 6

*United States v. Riccobene*, 709 F.2d 214 (3d Cir. 1985) .................................. 6

*United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010) ................................. 32

*United States v. Sarihifard*, 155 F.3d 301 (4th Cir. 1998) ................................. 6

*United States v. Scott*, 730 F.2d 143 (4th Cir. 1984)...........................................27

*United States v. Taylor,* 754 F.3d 217 (4th Cir. 2014) ..................................... 25-26

*United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993).................................. 10-11

*United States v. Wang*, 222 F.3d 234 (6th Cir. 2000)..............................................26

*Warfield v. State*, 315 Md. 474 (1989) ....................................................................19

*West v. State*, 312 Md. 197 (1988)..................................................................... 16-18

*West v. State*, 2016 WL 4478872 (Md. Aug. 25, 2016) ........................................ 16

## U.S. CONSTITUTION

U.S. Const. amend. VI ..............................................................................................6

## STATUTES

18 U.S.C. § 1962(c) .............................................................................................6, 11

18 U.S.C. § 1962(d) .........................................................................................4, 5, 27

18 U.S.C. § 3553(a) ...............................................................................................33

Md. Code Ann. Crim. Law § 3-401...........................................................................23

Md. Code Ann. Crim. Law §§ 6-201, *et seq.*..........................................................23

## RULES

Fed. R. Crim. P. 31(a) ...............................................................................................

Fed. R. Evid. 701 ....................................................................................................28

Fed. R. Evid. 403 ....................................................................................................28

## OTHER AUTHORITIES

Department of Justice, *Federal Narcotics Prosecutions* (2d ed. 2004)...................32

## SUMMARY OF ARGUMENT

The conduct of certain Baltimore City Police Department ("BPD") officers assigned to the Special Enforcement Section ("SES") and the Gun Trace Task Force ("GTTF") brought shame to a department with a long and venerable history. Momodu Bondeva Kento Gondo ("Gondo"), Evodio Calles Hendrix ("Hendrix"), Wayne Earl Jenkins ("Jenkins"), Jemell Lamar Rayam ("Rayam"), and Maurice Kilpatrick Ward ("Ward") unquestionably earned their convictions and prison sentences. Having charged and convicted two other BPD officers who briefly served in the GTTF, Maurice Taylor ("Taylor") and Daniel Hersl ("Hersl"), the government understandably has pulled out all the stops in a 122-page brief seeking to uphold those convictions.

But an argument is not persuasive just because it is long and is not correct just because it is passionate. All racketeering acts related to wire fraud are defective, because the record is devoid of evidence that defendants or coconspirators knew that the alleged overtime fraud scheme was executed through the wires or that such use was reasonably foreseeable to them. Taylor, Hersl, and their colleagues handed paper overtime slips to a timekeeper. Later in the payroll process BPD sent data to a payroll processor in South Dakota. No witness testified and no document demonstrated that wirings were foreseeable to any conspirator. Stripped of these wire fraud racketeering acts, defendants' convictions for racketeering conspiracy in

Count One must be reversed. The government's attempt to buttress Count One by importing into that count other racketeering acts from other counts is without merit.

In light of the fatal defects with the wire fraud racketeering acts, defendants' racketeering convictions in Count Two must be evaluated solely on the basis of racketeering acts related to robbery and conspiracy to rob. Those racketeering acts must fall as well. In addition to the factual and legal arguments set forth at length in the Consolidated Opening Brief of Appellants ("App. Br."), it is notable that the government seeks to defend certain racketeering acts on the basis of theories of accomplice liability under Maryland law that were never presented to the jury, either in instructions or in closing argument. A verdict can only be sustained based on a theory that was actually presented to the jury, and this Court cannot speculate that the jury might have found accomplice liability had it been instructed about the issue.

The flaws in Racketeering Acts 8 and 10 require the reversal of defendants Hobbs Act robbery convictions on Counts Three (Taylor) and Five (Hersl), respectively. Count Five founders for another reason: failure to prove that the charged incident affected interstate commerce. Notably, the government is unable to specify how much, if any, of the money taken from private citizens Ronald and Nancy Hamilton's private residence came from an entity that engaged in interstate commerce. Like the wire fraud foreseeability issue on Count One, the jury could do

no more than speculate about this jurisdictional element. Speculation cannot sustain a conviction.

The government is equally unpersuasive in defending certain evidentiary rulings that impermissibly prejudiced the defense. The cooperating codefendant police officers' incessant use of the term "robbery" imported impermissible lay expert testimony into one of the central issues of the case. Ronald Hamilton's expletive-laced tirade against the police rang a bell that no limiting instruction could unring and diverted the jury's attention from the evidence against Taylor and Hersl to the harms supposedly suffered by Hamilton and his family. Similarly, the government cannot sustain the district court's decision to proceed with the trial in face of substantial prejudicial pretrial publicity in the Baltimore area, and to deny a new trial after it emerged that while a government witness was testifying, a narcotics distribution conspiracy for which a grand jury later indicted him was ongoing.

Finally, notwithstanding the presumption that within-guidelines sentences are reasonable, the district court erred in failing to follow the lead of the Supreme Court and other courts that have tailored the sentences of police officers to take into account their vulnerability in the federal prison system. Only significantly reduced sentences that took that factor into account would have been reasonable.

3

**ARGUMENT**

## I.   NO RATIONAL TRIER OF FACT COULD HAVE FOUND BEYOND A REASONABLE DOUBT TWO RACKETEERING ACTS PER DEFENDANT ON COUNT ONE

In finding both defendants guilty of RICO conspiracy under 18 U.S.C. § 1962(d) in Count One, the jury returned general verdicts of guilty and special interrogatory findings specifying two racketeering acts for each defendant. For Hersl, the jury found Racketeering Acts 10 (July 8, 2016 - Hamiltons) and 14 (July 6, 2016 - interstate wire) and did not find 10 others. JA 1761-62; Tr. 2/12/18 at 18-19. For Taylor, the jury found Racketeering Acts 8 (March 22, 2016 - Oreese Stevenson) and 20 (August 3, 2016 - interstate wire) and did not find 10 others. JA 1763-64; Tr. 2/12/18 at 19. As previously demonstrated, the government failed to prove that it was reasonably foreseeable to any conspirator that the submission of paper overtime slips would lead to the use of interstate wires. Failure to prove a mandatory jurisdictional element requires reversal of Racketeering Acts 14 and 20 – and therefore requires reversal of Count One. The government falls flat in its attempts to pluck tidbits of evidence of foreseeability from the trial record. But before addressing that issue, as a threshold matter it is necessary to address the government's argument that the Count One conviction can be sustained based on racketeering acts the jury did not find for that count.

### A.    The Verdicts Cannot Be Sustained on Any Basis Other than the Two Racketeering Acts Specified for Each Defendant on That Count

Under *Salinas v. United States*, 522 U.S. 52 (1997), to prove a RICO conspiracy under 18 U.S.C. § 1962(d), the government must prove the existence of a RICO "enterprise" in which the defendant conspired to participate, and that the defendant conspired that a member of the enterprise would perform at least two racketeering acts constituting a "pattern of racketeering activity." Defendants and the government agree that under *Salinas,* a defendant can conspire to violate RICO and violate § 1962(d) without "himself commit[ting] or agree[ing] to commit the two or more" acts of racketeering activity. *Id.* at 65; *see* Brief of Appellee United States of America ("Gov. Br.") at 25. The district court's jury instructions on this issue (JA 1514-20) were correct. App. Br. at 26; Gov. Br. at 25-26.

From this uncontroversial starting point, however, the government leaps to the unsupportable position that Hersl and Taylor's convictions on Count One can be sustained on the basis of racketeering acts other than two acts the jury found as to each defendant on that specific count. First, the government argues that the convictions can be sustained based on language in defendants' brief describing other conspirators' conduct with regard to the Hamilton and Stevenson robberies Gov. Br. at 26 (citing App. Br. at 29). Apparently the government's position is that the Stevenson robbery can be imported into Hersl's Count One conviction (contrary to

the jury's failure to find Racketeering Act 8 as to Hersl) and that the Hamilton robbery can be imported into Taylor's Count One conviction (contrary to the jury's failure to find Racketeering Act 10 as to Taylor). Alternately, the government proposes importing into Taylor's Count One conviction Racketeering Act 12 (Sept. 7, 2016 – Summerville), which the jury did not find as to Count One, but did find as to the Count Two charge under 18 U.S.C. § 1962(c). Gov. Br. at 26-27.

Governing cases clearly refute the government's attempts to buttress the Count One conspiracy convictions with racketeering acts that the jury did not find as to each defendant in that count. In a federal trial, the defendant has a Sixth Amendment right to a unanimous jury verdict. *Johnson v. Louisiana,* 406 U.S. 356, 369 (1972); *Andres v. United States,* 333 U.S. 740, 748 (1948); *United States v. Sarihifard*, 155 F.3d 301, 310 (4th Cir. 1998) ("the Sixth Amendment guarantees that the jury's findings of guilt be unanimous"); *see* Fed. R. Crim. P. 31(a) (jury verdict must be unanimous). As reflected in the jury instructions, it is well-established that in both substantive and conspiracy RICO cases, the jury must unanimously agree on at least two of the same acts of racketeering activity. *United States v. Merlino,* 310 F.3d 137, 140 (3d Cir. 2002); *United Sates v. Riccobene,* 709 F.2d 214, 227-28 (3d Cir. 1985). Courts use special verdict forms in criminal RICO case to ensure that juries unanimously identify the predicate acts for the general verdict. *See United States v. Cianci*, 378 F.3d 71, 91 (1st Cir. 2004); *United States*

*v. Edwards,* 303 F.3d 606 (5th Cir. 2002); *United States v. Ham,* 58 F.3d 78, 81 (4th Cir. 1995) (example of verdict form).

In its verdicts for Hersl and Taylor, on Count One the jury identified only two racketeering acts for each defendant that it unanimously found either the defendant or another member of the conspiracy agreed to commit. In Taylor's case, the jury's finding with regard to the Summerville robbery in Count Two is of no relevance to Count One. As Justice Holmes stated in the foundational case on inconsistent verdicts: "Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." *Dunn v. United States,* 284 U.S. 390, 392 (1932). That is, "a jury is permitted to return an inconsistent verdict if it sees fit to do so." *United States v. Hassan,* 742 F.3d 104, 144 n.36 (4th Cir. 2014). That rule usually benefits the government; here it does not. Accordingly, while there was sufficient evidence for the jury to find that other conspirators agreed to commit the Hamilton robbery (Racketeering Act 10, but only as to Hersl) and the Stevenson robbery (Racketeering Act 8, but only as to Taylor), if the second racketeering act for each defendant related to wire fraud was not proven, Count One must fall.

### B.     The Specified Wire Transmissions Were Not Reasonably Foreseeable to Any Conspirator

The federal fraud statutes are not limitless. In language about mail fraud that fully applies to wire fraud, *see, e.g., United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1188 n.14 (4th Cir. 1982) (citations omitted), the Supreme Court has cautioned that the statute "does not purport to reach all frauds, but only those limited instances in which the use of the mails is part of the execution of the fraud." *Kann v. United States,* 323 U.S. 88, 95 (1944). Later, it held that "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, he 'causes' the mails to be used." *Pereira v. United States,* 347 U.S. 1, 8-9 (1954). Foreseeability is measured by an objective standard. *United States v. Edwards,* 188 F.3d 230, 233-34 (4th Cir. 1999). In all instances, "[the relevant question … is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck v. United States,* 489 U.S. 705, 715 (1989).

The government presented no evidence that the July 6, 2016 or August 3, 2016 wires between BPD and ADP, the company that managed the BPD's payroll (Racketeering Acts 14 and 20, respectively), were reasonably foreseeable to any conspirator. No GTTF officer knew about any connection between their paper overtime slips and use of the wires. To be sure, the conspirators were employed by

8

BPD, which uploaded time and attendance information to an ADP server in South Dakota, and most employees were paid through an electronic funds transfer, although no evidence was presented that any alleged conspirator was paid this way. But those facts just aren't enough to show that use of the wires was objectively, reasonably foreseeable. As the government concedes, the GTTF officers simply filled out paper overtime slips and handed the slips to a timekeeper, who then entered the information into ADP's eTime platform. Gov. Br. at 27-29. No evidence suggested, let alone proved, that any conspirator was trained in eTime, knew how eTime worked, or knew that later in the payroll process BPD sent wire communications. No timekeeper testified about communications with officers. No testimony of any BPD employee or contractor, and no document, supports the government's claims that "[t]he jury could have inferred" that defendants and coconspirators "had actual knowledge that the ADP eTime system generated the wires charged in Count One based on their interactions with the unit's timekeeper." Gov. Br. at 29. And the government never presented such a theory to the jury. To the contrary, its entire closing argument on the interstate wires element was the ADP witness "[t]estified that ADP's data center is in Sioux Falls, South Dakota. That element is met." JA 1602.

*United States v. Burfoot,* 899 F.3d 326 (4th Cir. 2018), involved precisely the kind of knowledge and foreseeability that is missing from this case. In *Burfoot,* the

government "offered testimony and evidence about Burfoot's familiarity with the Treasurer's office (he was, in fact, the Chief Deputy Treasurer) and how the office routinely accepted credit card payments for tax obligations," as well as his personal involvement in demanding a credit card payment. *Id.* at 335. Such evidence permitted the jury to find it was reasonably foreseeable to Burfoot that a developer would use an interstate wire transfer to comply with his demand to pay delinquent taxes. *Id.* at 336. Evidence that police officers handed a paper overtime slip to a timekeeper permits no such finding. Rather, as in *United States v. Bentz,* 21 F.3d 37 (3d Cir. 1994), the government failed to prove that the officers knew that BPD used wire transmissions in the ordinary course of its business. In *Bentz,* "use of the wire by a scrap metal storage facility in Pennsylvania which issues checks drawn on a Pennsylvania bank is not self-evident." *Id.* at 41 (citation and footnote omitted). Likewise, it was not self-evident that a city police department would need to use the wires to pay its own officers.

In addition to *Bentz,* this case mirrors *United States v. Walters,* 997 F.2d 1219 (7th Cir. 1993), where a sports agent who improperly gave cars and money to college athletes successfully challenged mail fraud convictions based on mailings that occurred when universities required the athletes to complete forms verifying their eligibility and mailed copies to athletic conferences. *Id.* at 1221. Judge Easterbrook noted that "[n]o evidence demonstrates that Walters *actually* knew that the colleges

would mail the athletes' forms." *Id.* at 1223 (emphasis in original). Rejecting the government's foreseeability argument, he asked: "What was it about these forms that should have led a reasonable person to foresee their mailing?" *Id.* And he added: "The prosecutor must *prove* that the use of the mails was foreseeable, rather than calling on judicial intuition to repair a rickety case." *Id.* at 1224. Inferences must be derived from facts, not speculation. *Sullivan v. Louisiana,* 508 U.S. 275, 277–78 (1993); *Moore v. United States,* 271 F.2d 564, 568 (4th Cir. 1959) ("evidence creating a mere probability of guilt or giving rise to a mere suspicion or conjecture of guilt is not sufficient.").

Use of the wires is not reasonably foreseeable every time a person hands a piece of paper to another person who is sitting at a computer. As a result, the government failed to prove two racketeering acts as to each defendant on Count One. Both RICO conspiracy convictions should be reversed.

## II.   THE GOVERNMENT FAILED TO PROVE TWO RACKETEERING ACTS PER DEFENDANT ON COUNT TWO

For the substantive racketeering convictions under 18 U.S.C. § 1962(c) in Count Two, this Court should again set aside all racketeering acts based on wire fraud. Additionally, the government's defense of the remaining racketeering acts based on Maryland state law offenses is not supported by the trial record.

### A.    Hersl Did Not Commit or Conspire to Commit Robberies

#### 1.    For Racketeering Act 3 (Griffin), the Jury Rejected the Government's Extortion Theory and the Evidence Did Not Support Its Robbery Verdict

The pertinent portion of the verdict form relating to Racketeering Act 3 provided:

> **Racketeering Act Three** (November 5, 2014, Jimmie Griffin)
>
> You may only find that Defendant **HERSL** committed (a) or (b) but NOT both:
>
> a.  committed robbery in violation of Maryland Criminal Code § 3-402.
>
> Proved ____✓____     Not Proved _____
>
> b.  committed extortion in violation of Maryland Criminal Code § 3-702;
>
> Proved _____     Not Proved _____

JA 1764.

Try as it might, the government cannot escape the fact that Griffin's testimony only supported a theory of extortion, not robbery. Griffin said that Hersl was armed but acknowledged that he consented to let Hersl search his person and home. JA 1123. Furthermore, Griffin was not present when his home was searched, JA 1139, meaning that he could have revoked his consent had he still felt force or the threat of force at that time. In closing argument, the government conceded that Griffin was extorted, not robbed. The prosecutor stated:

> Now, the racketeering acts are robberies, extortions. And there's two types of extortions. There's extortions with force and extortions under color or pretense of office.

12

So I'm going to start with robbery. The judge has instructed you on the elements. A robbery is the taking and carrying away of property from someone else, or someone else's presence and control, by force or threat of force, with the intent to deprive the victim of the property.

Throughout this trial we asked every single citizen who took that stand whether they were restrained, whether they were arrested.

And you heard testimony not only from these citizens, but from the officers who engaged in some of these crimes as well. Every episode had force applied. Force is as simple as handcuffs restraining a victim (indicating).

Not only did those episodes have force, but there was the threat of force in every single episode as well.

Rightfully so, individuals testified in this case that when the police came to their house with vests, guns, that they submitted, they gave up, and that's the element of the threat of force that they established. They told you what they believed would happen to them if they resisted.

You'll be asked to make a distinction between robbery and extortion. We submit to you that the evidence shows in every single racketeering act except for one, *every single one of those racketeering acts is a robbery except for Jimmie Griffin*. The key distinction is whether or not there was consent.

An extortion is when an officer – officer or employee of the state may not wrongfully obtain or attempt to obtain money, property, or anything of value from a person with the person's consent, if the consent is obtained by wrongful use or actual or threatened force of violence.

*Jimmie Griffin testified that he consented.* That's why we asked the question over and over to every single witness. Every single other witness in this case testified that they did not consent to having their property taken.

13

JA 1576-77 (emphasis added). When he returned to the Griffin incident, the prosecutor stated: "Turning to Count [sic] 3, the extortion of Jimmie Griffin, the only person to consent to the taking of his money." *Id.* at 1581. He explained that just as intent is required for robbery, "[i]ntent is required under the extortion element prong as well." *Id.* at 1582. And, as previously noted, the prosecutor later stated:

> So for Racketeering Act 3, Jimmie Griffin did testify that he consented. And the Government has proven beyond a reasonable doubt that Mr. Griffin committed extortion – or was the victim of extortion by Mr. Hersl and that the extortion involved the wrongful use and threatened force of violence and extortion under color and pretense of office.

*Id.* at 1583.

This concession was completely consistent with Maryland law discussed in App. Br. 39 and the Supreme Court's decision in *Ocasio v. United States,* 136 S.Ct. 1423 (2016). Addressing the distinction between extortion and robbery under the Hobbs Act, the Supreme Court held in *Ocasio* that extortion involved obtaining property from another with consent, while robbery involved obtaining property from a person against his will, so that "'consent' simply signifies the taking of property under circumstances falling short of robbery…." *Id.* at 1435. The government cannot salvage its position by placing the word consent in quotation marks, Gov. Br. at 35, or invoking the hypothetical possibility that under now-superseded Maryland common law there some circumstances where "consent is not a voluntary act" that

14

"*may* constitute a larceny." *Santoni v. State,* 5 Md. App. 609, 622 (1969).[1] Modern Maryland law is clear: robbery requires taking property without the owner's consent. *Leeson v. State,* 293 Md. 425, 435 (1982). The government is bound by its concession. Racketeering Act 3 cannot stand.

### 2.    For Racketeering Act 4 (Tate), Hersl Was Neither a Principal Nor an Accomplice to a Robbery

The government argues alternately that Hersl was a principal or an accomplice in the alleged robbery of Herbert Tate. No evidence supports the contention that Hersl was a principal. Gov. Br. at 39-40. While Tate testified that Hersl grabbed him and began a search, he acknowledged that Hersl did not handcuff him and did not personally take anything from him. JA 777-80. Officer Fassl – who did not testify – took money from Tate's pocket and retained it, supposedly at Hersl's direction. JA 785. Sgt. Burns, not Hersl, declined Tate's request to count the money. JA 786. Sgt. Swinton testified that paperwork for Tate's arrest listed Hersl as the arresting officer and showed the submission of $216 in currency (less than what Tate claimed he possessed), but did not say that Hersl submitted the funds. JA 1095-96.

The government then theorizes that the jury "could have concluded that Hersl was a second degree principal and that Fassl was a first degree principal," Gov. Br. at 40, or that "Hersl was an accomplice to Fassl as the principal." *Id.* at 41. But the

---

[1]    *Santoni* preceded the rewriting of Maryland theft offenses in 1979. *See Lee v. State,* 59 Md. App. 28, 32-35 (1984).

government never argued accomplice liability for the Tate robbery, JA 1583-86, and did not ask the court to give Maryland Criminal Pattern Jury Instruction 6:00 (Accomplice Liability) (quoted in *West v. State,* 2016 WL 4478872 at * 5 n. 6 (Md. Aug. 25, 2016)). Consequently, the district court's jury instructions relating to robbery under Maryland law did not address accomplice liability. JA 1536-38. While the court instructed the jury on aiding and abetting, those instructions were explicitly limited to the Hobbs Act charges in Counts Three and Five. JA 1554-57. A verdict can only be sustained if the jury was instructed on the specified legal theory and "the submission of those fact issues to the jury," and this Court cannot infer that a jury instructed about accomplice liability would have convicted on that basis. *Nye & Nissen v. United States,* 336 U.S. 613, 618 (1949) (*Pinkerton* theory); *United States v. Mata,* 491 F.3d 237, 242–43 (5th Cir. 2007); *United States v. Luciano–Mosquera,* 63 F.3d 1142, 1150 n. 3 (1st Cir. 1995); *United States v. Labat,* 905 F.2d 18, 23 (2d Cir. 1990). Because the jury was not instructed about accomplice liability under Maryland law, the jury finding on Racketeering Act 4 cannot be sustained on that basis.

### 3.     For Racketeering Act 5 (Santiful), the Government Failed to Prove Hersl Committed a Robbery

For the racketeering act related to Antonio Santiful, the government faces an insurmountable obstacle in *West v. State,* 312 Md. 197 (1988), where the Maryland Court of Appeals held that a purse snatching was not robbery because the evidence

16

did not prove the purse was taken with violence, or that the victim was put in fear. Not surprisingly, the government does not address *West* ("the mere snatching or sudden taking away of the property from the person of another does not constitute sufficient force, violence, or putting in fear to support a robbery conviction"), *id.* at 206, or *Cooper v. State*, 9 Md. App. 478, 480 (1970) ("it is not robbery … to pick another's pocket without using more force than is necessary to lift the property from the pocket … [or] suddenly snatch property from another when there is no resistance…").

Instead, the government devotes pages to the uncontested proposition that issues involving force, intimidation, and fear of bodily harm are measured by an objective standard. Gov. Br. at 43-45. That's not the issue. The issue is whether, objectively, Hersl committed robbery when he removed car keys or cash from Santiful's pocket. On that issue, the government's reliance on *Coles v. State,* 374 Md. 114 (2003), is misplaced. Coles robbed the same branch of the same bank three times. The first time, Coles handed the teller a note that said "[P]ut some money in the bag" and "not to hit an alarm, not to let anybody know." *Id.* at 117. The second time, the note read: "Put the money in the bag, no bait money, and no one will get hurt." *Id.* He also applied physical force to retrieve the note. The third time, the note read: "Put all the money in the bag no alarms thank you." *Id.* at 118. Affirming Coles's robbery convictions, the Court of Appeals held that the first note

17

"constituted an unequivocal demand for money and an intimidating command *not* to let anyone know that Coles was stealing the money," and further noted that when Coles discovered the teller had not returned his note, he warned that she "better find it." *Id.* at 129. For the second, "[o]bviously, the language that 'no one will get hurt' is sufficient to suggest bodily harm for non-compliance." *Id.* at 130. And for the third, the court held that a rational fact finder "could have concluded that the demand of, 'Put all the money in the bag,' and the command, 'no alarms,' were sufficient to create fear of bodily harm." *Id.*

This case is much closer to *West* than Coles. Hersl did not verbally threaten or submit an implicitly threatening note. At most, Hersl's actions were tantamount to snatching property and do not support a finding that he committed robbery.

### 4. For Racketeering Act 10 (Hamiltons), Hersl Did Not Commit or Conspire to Commit Robbery

The government does not dispute that Hersl played an extremely limited role in the events related to Ronald and Nancy Hamilton on July 8, 2016. Nevertheless, it argues that the jury could have found that Hersl committed Racketeering Act 10 as a conspirator, a principal, or any accomplice. Gov. Br. at 47. For the reasons set forth in section II-A-2, accomplice liability must be rejected because the jury was not instructed on this theory. The verdict can only be sustained if the government proved Hersl was a knowing member of the Jenkins-Rayam-Gondo conspiracy or that he was a principal in a robbery. He was not.

18

The government first claims that Hersl joined the conspiracy because "he searched the house with [Rayam and Gondo] looking for money," before local officers arrived. Gov. Br. at 56. Parsing through the inconsistent accounts offered by Rayam, Gondo, and Ronald Hamilton, the most that can be said about the sequence of events relating to Hersl's actions (or lack thereof) at the Hamiltons' house was:

(1) Rayam and Jenkins entered the house, Hersl stayed outside, JA 935, 987-88;

(2) after Hamilton and his wife were taken inside, Hersl watched them, JA 937-38;

(3) when Rayam, Gondo and Hersl were in the bedroom, money was found; Jenkins told Rayam to take the money; Rayam mentioned this to Gondo and Hersl; and Hersl said "Okay, whatever." JA 599-600;

(4) Hersl was present when Jenkins asked whether Hamilton knew of other "bigwigs" that could be robbed, but did not say or do anything. JA 601-02;

(5) other officers split up stolen money; Jenkins supposedly received Hersl's portion, but no one testified that Hersl received any money. JA 603-05, 1184-86.

These facts establish nothing more than Hersl's mere presence at the place where others committed a crime, which does not establish he conspired to rob the Hamiltons. *Warfield v. State,* 315 Md. 474, 491 (1989). Recognizing the problem, the government argues that the jury could have found Hersl guilty because of an

overarching conspiracy among the GTTF officers to commit robberies. *Id.* at 56. This argument fails in several ways. First, it is tautological, because it maintains that Hersl was guilty of racketeering conspiracy because he participated in a robbery conspiracy that in turn was proven by the racketeering conspiracy. That argument obliterates the distinction between participating in a racketeering enterprise and committing predicate acts. Second, if there was a long-running conspiracy to rob (as opposed to a discrete conspiracy to rob the Hamiltons), then why didn't the government request the district court to include conspiracy to commit robbery as an option for the jury for the other racketeering acts the jury found against Hersl? *See* JA 1764-65. For Racketeering Act 10 in Count Two, the narrow issue was whether the government proved that Hersl committed or conspired to commit the Hamilton robbery on July 8, 2016, as opposed to being merely guilty of associating with Rayam, Gondo, and Jenkins. It did not.

Turning to the question of whether Hersl was a principal, the government implicitly concedes that Hersl personally did not take and carry away of the Hamiltons' personal property by using violence or putting them in fear. It argues, however, that by his mere presence during the bedroom search, and by watching the Hamiltons, Hersl was "a principal in the second degree," essentially an aider and abettor. Gov. Br. at 58-59. Once again, however, jury was never instructed on such

a theory. *See* Section II-A-2. The government therefore cannot rely on this theory to salvage its robbery claim.

As a final "Hail Mary" on this racketeering act, the government attempts to cobble together a circumstantial claim "that Hersl stole $3,000 of the $20,000 that was found in the Hamiltons' bedroom…" Gov. Br. at 59. This specious claim rests on the fact that Rayam and Gondo stole $20,000 but later couldn't find $3,000 of it. Rayam claimed that Hersl was briefly alone with the $20,000. In a conversation with Jenkins, Rayam and Gondo blamed Hersl. They also talked about the money on a wiretapped conversation – the transcript of which has so little probative value that the government does not quote it and did not include it in the joint appendix, just as the government does not quote *any* recorded conversation involving Hersl. These meager facts cannot sustain the jury's finding on Racketeering Act 10.

Hersl's conviction on Count Two should be reversed.

### B.    Taylor Did Not Commit or Conspire to Commit Robberies

#### 1.    For Racketeering Act 2 (Whiting), Taylor Did Not Conspire to Commit Robbery

The government relies upon the testimony of former Detective Maurice Ward to support its contention that it proved that Taylor conspired to commit a robbery of Shawn Whiting. Gov. Br. 61-64. Ward's testimony actually proves the opposite. Ward was in charge of the Whiting case. JA 182. When questioned about his intention with respect to the Whiting search, Ward testified:

> Q.    And it was your intent – when you wrote that search
>        warrant, was it your intent to do a proper and lawful
>        search of the premises of Mr. Whiting?
>
> A.    What do you mean by a "proper" and - -
>
> Q.    Was it your intent to steal, or was it your intent to get
>        drugs and guns off the street?
>
> A.    50/50, I would say.

JA 337. Ward acknowledged that some police officers shared his mixture of criminal intent with trying to do the right thing, *id.*, but never specified that Taylor shared his criminal intent. *Id.* at 337-38. Moreover, Ward's testimony that Taylor alerted everyone present at the search when he found money, including officers who were not part of the GTTF, directly contradicts that Taylor shared Ward's criminal intent from the outset. JA 180-81. On these facts, there was insufficient evidence for the jury to find that Taylor knowingly participating in a conspiracy to rob Whiting.

### 2.    For Racketeering Act 8 (Stevenson), Taylor Did Not Conspire to Commit Robbery

The Oreese Stevenson incident involved two discrete events: (1) the stopping of Stevenson's vehicle; and (2) the search of Stevenson's residence. Taylor was a passive observer to the vehicle stop. After the stop, Taylor did search the vehicle and recovered drugs and cash, but the government presented no evidence that Taylor or anyone else removed the vehicle anything other than drugs and cash that were properly turned over to BPD's evidence control unit. Hendrix testified that Taylor

22

gave him the cash from the vehicle and it was submitted to BPD's evidence control unit. JA 492-94. Jenkins, who had stopped Stevenson, did take Stevenson's residence key which GTTF task force members then used to do a "sneak-and-peek" of the residence. JA 484-88. Based on the sneak-and-peak, Hendrix and Jenkins obtained a search warrant for the residence. JA 488. When the group returned to the residence, Mrs. Stevenson was present but was asked to leave given that a warrant had been issued.

The government contends that Taylor not only conspired to rob Stevenson, but actual participated in robbing him. Gov. Br. at 75. However, the only arguably illegal events in which Taylor actually participated *vis-à-vis* Stevenson's property occurred at the Stevenson residence. Stevenson was not present at the residence. Taking property from the residence was at most a burglary, not robbery. *Compare* Md. Code Ann. Crim. Law § 3-401 *with* Md. Code Ann. Crim. Law §§ 6-201, *et seq*. Taylor was not charged with burglary and burglary is not a RICO predicate. Even viewed in the light most favorable to the government, the evidence does not support a verdict that Taylor conspired to rob Stevenson or was an active participant in robbing him.

### 3. For Racketeering Act 12 (Summerville), Taylor Did Not Conspire to Commit Robbery

The government's defense of Racketeering Act 12 relies entirely on the testimony of Rayam, who said that (1) he entered the storage unit with Taylor, (2) Taylor mentioned that the storage unit had cameras, and (3) Rayam handed Taylor "a couple dollars, some money," without saying whether that money came from the storage unit. Gov. Br. at 76. Rayam also mentioned giving a $60 to Taylor in a conversation with Gondo, again without specifying where the money came from. *Id.* at 77. And Summerville testified that Taylor and Rayam were two of the officers who walked towards his storage unit. *Id.* at 79. A juror hearing such evidence could certainly have suspicions about Taylor's conduct. But no rational juror could have woven these filaments into a supportable conclusion that all elements of conspiracy to commit robbery had been proven beyond a reasonable doubt. For this reason, Racketeering Act 12 cannot be sustained.

### III. THE GOVERNMENT FAILED TO PROVE THE HOBBS ACT ROBBERIES IN COUNTS THREE AND FIVE AS TO HERSL AND TAYLOR, RESPECTIVELY, AND FAILED TO PROVE THAT THE COUNT FIVE ROBBERY AFFECTED INTERSTATE COMMERCE

For the reasons set forth in Sections II-B-2 and II-A-4, Taylor did not rob Stevenson and Hersl did not rob or conspire to rob the Hamiltons, requiring reversal of Counts Three and Five. Additionally, on Count Five the government once again stumbles on the jurisdictional element, specifically the interstate commerce

24

component of the Hobbs Act. While the government must only prove a "minimal" effect on interstate commerce, including by proving depletion of assets of a business engaged in commerce, App. Br. at 48, Gov. Br. at 81-82, it failed to prove such a link between interstate commerce and the money stolen from the Hamiltons' home.

Ronald Hamilton testified that his income came from (1) an assisted living facility in Baltimore; (2) rental properties; (3) gambling; and (4) selling used cars that he purchased at auctions in Maryland and Pennsylvania. As to items (1)-(3), the government offered no evidence that these activities involved interstate commerce. As to item (4), the government offered no evidence about how much, if any, of the approximately $20,000 in cash stolen from the Hamiltons came from the car business. In closing argument, the government said nothing about the Hobbs Act interstate commerce element. On this record, it was impossible for the jury to conclude beyond a reasonable doubt that the robbery affected interstate commerce.

The government misreads *United States v. Taylor,* 754 F.3d 217 (4th Cir. 2014), which held that the robbery of a drug dealer sufficiently affected interstate commerce to fall within the Hobbs Act. *Id.* at 221-26. (The Supreme Court endorsed this position in *Taylor v. United States,* 136 S.Ct. 2074 (2016)). But as noted in App. Br. at 48, this Court's *Taylor* decision emphasized that the Hobbs Act is not limitless, that not every robbery obstructs commerce, and that the Act was not violated when private citizens were robbed in a private residence of money, "some of which just

happened to 'belong[] to a restaurant doing business in interstate commerce." 754 F.3d at 226 (quoting *United States v. Wang,* 222 F.3d 234, 240 (6th Cir. 2000)).

The government does not directly address *Wang* but argues that Hamilton's situation was different because he owned and operated the car business rather than being employed by it. Gov. Br. at 85. That distinction proves nothing. In *Wang,* a former cook at a Chinese restaurant that engaged in interstate commerce robbed the restaurant's owners at their home, stealing funds that included $1,200 from the restaurant. 222 F.3d at 240. The government did not show a substantial connection between the robbery and the restaurant's business, without which "there is no realistic probability that the aggregate of such crimes would substantially affect interstate commerce." *Id.*

Hamilton testified that BPD officers seized $3,400 from him at the traffic stop, JA 944, but these funds were never linked to interstate commerce. He further testified that the agents seized $75,000 at his home, $50,000 of which was heat-sealed (and not stolen). *Id.* at 944-49. Hamilton said his money came "[f]rom car sales. And I – I had just won like 40-something thousand from the casino." *Id.* Through Hamilton's testimony and exhibits, the government established that Hamilton received more than $75,000 in rental income, JA 949-51, but not how much he received from car sales. JA 951-53. With regard to the approximately $20,000 that the GTTF witnesses testified was stolen, the government made no effort

26

to show that any of it was linked to the car business that operated in interstate commerce, as opposed to other businesses or gambling, and did not prove the robbery had anything to do with the car business.

In other words, the GTTF officers robbed private citizens in a private home of cash that could not be conclusively linked to interstate commerce. Any conclusion by the jury that the robbery involved funds from car sales was pure speculation. The burden of proof "is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime." *Davis v. United States,* 160 U.S. 469, 487 (1895); *United States v. Scott,* 730 F.2d 143, 147 (4th Cir. 1984) (reversing mail fraud count where "the Government failed to present proof of mailing which would allow a jury to conclude beyond a reasonable doubt that appellants committed mail fraud."). It did not do so. Count Five should be reversed.

## IV.    THE DISTRICT COURT IMPERMISSIBLY PERMITTED EXCESSIVE USE OF THE LEGAL TERM "ROBBERY"

Before and during trial, the district court directed prosecutors to "be restrained" and not use the word robbery "unnecessarily." JA 160, 563. Yet, again and again, witnesses who had entered guilty pleas under 18 U.S.C. § 1962(d) claimed again they had pled guilty to "robbery," and prosecutors repeatedly asked if they had "robbed" victims. The government claims there was no alternative. Gov. Br. at 91. Here's an alternative: the witnesses could have testified that they pleaded

27

guilty to racketeering conspiracy, and the government could have asked these witnesses about the myriad times they stole money, drugs, or both.

The government claims that "[r]obbery is not some magic word, the utterance of which divests the jury of its role," Gov. Br. at 91, but the question of whether the defendants committed robbery or some other offense which was not a RICO predicate act was central to the case. The non-stop testimony of police officers formerly employed to enforce Maryland law that that they committed robberies in violation of Maryland law should have been excluded under Fed. R. Evid. 403 and fatally prejudiced defendants with respect to this issue.

The government also claims that the former officers' characterization of certain acts as robberies did not constitute impermissible lay witness testimony under Fed. R. Evid. 701 because the officers "weren't interpreting anything." Gov. Br. at 92. The jury may have thought otherwise and viewed the testimony as an interpretation that the officers' acts – and therefore the defendants', when the testimony related to group activity – satisfied the elements of robbery under the Maryland Code. Such testimony ran afoul of this Court's prohibition on opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts. *United States v. McIver,* 470 F.3d 550, 561-62 (4th Cir. 2006) (citation omitted).

Taken as a whole, the excessive use of the term robbery was reversible error.

## V. THE DISTRICT COURT'S FAILURE TO DECLARE A MISTRIAL AFTER RONALD HAMILTON'S OUTBURST WAS REVERSIBLE ERROR

In the middle of a trial of Hersl and Taylor – not the other GTTF officers who admitted robbing his house – Ronald Hamilton ignored the question posed to him and declared repeatedly that "this right here destroyed my whole fuckin' family" and "destroyed my whole family," including causing a divorce and financial pressure. JA 1028-29. The district court struck the testimony and gave a limiting instruction but denied a motion for a mistrial.

The government claims that Hamilton's victim-impact testimony, which might have been appropriate for a sentencing hearing but was out of bounds at trial, was not prejudicial because "[n]one of what he said implicated either Hersl or Taylor in the robbery" and the two defendants on trial did not deny that others had committed the robbery. Gov. Br. at 99; *see also id.* at 100 (testimony about impact on family "did not prejudice the defendants who maintained they played no part in it.") The contention that impermissible testimony cannot be prejudicial if defendants deny their guilt is baffling. Hamilton's outburst was inadmissible *precisely because* it had nothing to do with the defendants' guilt. It was fatally prejudicial for the same reason: it created the unacceptable risk that the jury would convict Hersl and Taylor solely because of sympathy for Hamilton or outrage at the damage that his family

29

had suffered. *See* App. Br. at 58-59 (collecting cases where limiting instructions were insufficient to ameliorate prejudice).

The government makes much of the fact that defense trial counsel did not seek a mistrial until the morning after the outburst (Gov. Br. at 97) or that Hersl's counsel apologized in closing argument for Taylor's counsel's cross-examination of Hamilton. *Id.* at 99. Those tactical decisions did not forfeit the issue and hardly undermine defendants' claims that the outburst fatally prejudiced their trial. The government also notes the length of the trial and the other evidence presented. *Id.* at 101. That argument has little traction in light of the emotional wallop that Hamilton's outburst delivered. Unringing that bell was simply not possible.

## VI.    THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED TAYLOR'S MOTION TO DISMISS OR POSTPONE BECAUSE OF PRETRIAL PUBLICITY

The government does not dispute that Taylor's motion to dismiss the superseding indictment or continue the trial documented extensive media coverage of the case and multiple press releases by the United States Attorney's Office. The government also concedes that 23 potential jurors responded affirmatively to the district court's question about pretrial publicity and were questioned individually at the bench. Gov. Br. at 103. Nevertheless, the government maintains that Taylor failed to establish either a presumption of prejudice or actual prejudice under *Skilling v. United States*, 561 U.S. 358 (2010).

The government is incorrect. As previously noted, the *Skilling* Court reaffirmed that "[n]o hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." *Id.* at 386. As demonstrated by responses during the individualized questioning, the pretrial publicity was long-running, widespread, and very negative, in a metropolitan area much smaller than in *Skilling*. Regardless of the innocuous answers provided by the one juror from this group who was actually seated, the responses collectively proved Taylor's point – that the entire jury pool was affected by pretrial publicity. No amount of *voir dire* conducted by the district court could ever counteract the pretrial publicity and grant Taylor a fair trial. Even if the district court believed that dismissal of the charges against Taylor was not warranted, the only way to protect Taylor's right to a fair trial was a cooling off period so that the impact of the prejudicial coverage could recede before a jury was empaneled. Failure to do so was an abuse of discretion.

## VII.   THE TRIAL COURT ERRED BY FAILING TO GRANT A NEW TRIAL FOLLOWING DEFENDANTS' DISCOVERY OF THE CHARGES AGAINST WITNESS ANTONIO SANTIFUL

The prosecutors do not dispute that the same branch of the same U.S. Attorney's Office where they work charged government witness Antonio Santiful with participating in a narcotics conspiracy that began in 2017, two months prior to Santiful's testimony, and that defense counsel had not been informed of Santiful's drug trafficking at the time he testified. Nor do they dispute their duty, under *Kyles*

*v. Whitley*, 514 U.S. 419 (1995), and *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010), "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437.

Instead, relying on a factual finding by the district court, the government argues that there was nothing about Santiful's conduct to impute to any prosecutor until after the trial of Taylor and Hersl concluded. Gov. Br. at 115. This factual finding is clearly erroneous. Federal narcotics prosecutions are complex undertakings. The second edition of the Department of Justice's *Federal Narcotics Prosecutions* manual is more than 1,000 pages long. Federal narcotics conspiracy investigations involve wiretaps, surveillance, warrants, and other tools that require extensive coordination between the United States Attorney's Office and the law enforcement agency or agencies conducting the investigation. It is simply not credible that an investigation of a long-running conspiracy, which resulted in an indictment on May 8, 2018, had not been initiated by February 1, 2018. Knowledge of that investigation should be imputed to prosecutors in the same office who were handling this case. Failure to disclose that information violated Hersl and Taylor's constitutional rights.

The government also errs in arguing that the undisclosed information was not material, because it was sufficient for defense counsel to cross-examine Santiful about prior convictions for firearms and narcotics charges. It argues that

"[i]nformation that he was under investigation would not have been nearly as consequential as actual convictions." Gov. Br. at 115. What the government failed to disclose, however, was not merely information that Santiful was "under investigation," but in all likelihood information that he was actually re-engaged in the drug trade in the very same neighborhood where the acts charged in Racketeering Act 5 took place. The government further argues that there were other witnesses regarding the Santiful incident. Given the many holes in the prosecution's proof regarding Racketeering Act 5 (*see* Section II-A-3), however, there is no merit to any claim that this act could have been proven beyond a reasonable doubt without the testimony of the alleged victim.

Applying the governing *de novo* standard of review, this Court should find a material *Brady* violation and reverse the district court's denial of a new trial.

## VIII.  THE SENTENCES WERE UNREASONABLE

### A.    Hersl

Defendant Hersl does not dispute that the district court addressed the relevant factors under 18 U.S.C. § 3553(a) and that a within-Guidelines range sentence is presumptively reasonable. But in this case that presumption has been overcome. A 216-month sentence for a former police officer is the functional equivalent of a much longer sentence for a different offender. The Bureau of Prisons frequently designates such defendants to penitentiaries thousands of miles from their place of residence,

to minimize interaction with prisoners they may have investigated or arrested. Even at such a distance, encounters between police defendants and the people they helped to incarcerate are not uncommon and can lead to incidents and even confinement in segregated housing units. Meanwhile, the defendant is housed far from family and friends – in Hersl's case, far from his elderly mother, his young son, and the rest of his family and friends.[2] The Supreme Court and other courts have taken these factors into account in sentencing decisions concerning police officers. App. Br. at 69-70. The district court's failure to do so here was not reasonable.

### B.     Taylor

For the same reasons, Taylor's sentence was also unreasonable. Taylor was a "newbie" to the GTTF and played a significantly lesser role in the unit's conduct than the more culpable officers who testified for the government. It was foreseeable to the district court that, as a former police officer, he would be (as indeed he has been) designated to a Bureau of Prisons facility thousands of miles from his friends, his family, and particularly his young son. The district court's failure to follow courts that took such factors into account was not reasonable.

---

[2]     Hersl is housed at the Bureau of Prisons' MCFP Springfield facility in Springfield, Missouri. Taylor is housed at the FCI Forrest City facility in Forrest City, Arkansas. *See* https://www.bop.gov/inmateloc (last visited Feb. 7, 2019).

## CONCLUSION

Defendants Hersl and Taylor should be granted judgments of acquittal or, alternatively, a new trial or new sentencing hearings.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), appellants respectfully request that this Court hear oral argument in this case. This appeal raises significant issues regarding the scope of the wire fraud statute and the Hobbs Act as well as issues regarding the relationship between the federal RICO statute and state law robbery offenses.

Respectfully submitted,

/s/ H. Mark Stichel
H. Mark Stichel
Astrachan Gunst Thomas, P.C.
217 East Redwood Street, 21ˢᵗ Floor
Baltimore, Maryland 21202
hmstichel@agtlawyers.com
410-783-3550


/s/ C. William Michaels
C. William Michaels
1579 Dellsway Road
Baltimore, Maryland 21286
cwmichaels@earthlink.net
443-846-5207
*Attorneys for*
*Marcus Roosevelt Taylor (No. 18-4414)*

/s/ Stuart A. Berman
Stuart A. Berman

Nida Kanwal  *On Brief*
Lerch, Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, Maryland 20814
saberman@lerchearly.com
nkanwal@lerchearly.com
301-657-0729
*Attorneys for Daniel Thomas Hersl*
*(No. 18-4453)*


Dated:  February 8, 2019

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word, Times New Roman, 14 point.</u>

2.  Exclusive of the table of contents; table of citations; certificate of compliance and the   certificate of service, this Consolidated Reply Brief of Appellants contains <u>8,334 words.</u>

I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.

/s/ H. Mark Stichel
H. Mark Stichel
Astrachan Gunst Thomas, P.C.
217 East Redwood Street, 21ˢᵗ Floor
Baltimore, Maryland 21202
hmstichel@agtlawyers.com
410-783-3550

/s/ C. William Michaels
C. William Michaels
1579 Dellsway Road
Baltimore, Maryland 21286
cwmichaels@earthlink.net
443-846-5207
*Attorneys for*
*Marcus Roosevelt Taylor (No. 18-4414)*

/s/ Stuart A. Berman
Stuart A. Berman

Nida Kanwal  *On Brief*
Lerch, Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, Maryland 20814
saberman@lerchearly.com
nkanwal@lerchearly.com
301-657-0729
*Attorneys for Daniel Thomas Hersl*
*(No. 18-4453)*

36

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Rule 25 of the Rules of the United States Court of

Appeals for the Fourth Circuit, I hereby certify that I have this February 8,

2019, filed the required copies of the foregoing Consolidated Reply Brief of

Appellants in the Office of the Clerk of the Court, via hand delivery and

electronically using the Court's CM/ECF system which will send notification

of such filing to the following counsel:

Leo Joseph Wise
Derek Edward Hines
Assistant United States Attorneys
OFFICE OF THE UNITED
STATES ATTORNEY
4TH Floor
36 South Charles Street
Baltimore, MD 21201-0000

<u>/s/ Stuart A. Berman</u>
Stuart A. Berman
Lerch, Early & Brewer
Suite 700
7600 Wisconsin Avenue
Bethesda, MD 20814
301-657-0729
saberman@lerchearly.com